# United States Court of Appeals

*for the*

# Third Circuit

Case No. 22-3235

WANDREA RUSSO,

*Plaintiff-Appellant,*

– v. –

THE BRYN MAWR TRUST COMPANY.

*Defendant-Appellee*

ON APPEAL FROM AN ORDER OF THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA IN CASE NO. 2-19-CV-02408

## BRIEF AND APPENDIX ON BEHALF OF
## PLAINTIFF-APPELLANT
### Volume 1 of 3 (Pages Appx1 to Appx29)

MARK D. SCHWARTZ
*Attorney for Plaintiff-Appellant*
P.O. Box 330
Bryn Mawr, Pennsylvania 19020
(610) 525-5534
markschwartz6814@gmail.com

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................ ii

PLAINTIFF'S/APPELLANT'S BRIEF IN  SUPPORT OF HER APPEAL ............1

I.      JURISDICTIONAL STATEMENT ................................................1

II.     ISSUES FOR APPEAL ..............................................................1

III.    STATEMENT OF RELATED CASES AND PROCEEDINGS ...................1

IV.     STATEMENT OF THE CASE PROCEDURAL BACKGROUND .............1

V.      SUMMARY OF ARGUMENT ......................................................3

VI.     STANDARD OF REVIEW ..........................................................4

VII.    ARGUMENT ..........................................................................4

        A.      STANDARD FOR SUMMARY JUDGMENT ...............................4

        B.      THERE IS SUFFICIENT EVIDENCE FOR A
                REASONABLE JURY TO FIND IN PLAINTIFF'S FAVOR
                ON HER DISCRIMINATION CLAIMS ...............................6

        C.      AN EXAMINATION OF THE DECISION BELOW ........................8

                Constructive Discharge is a Factual Matter for a Jury .............10

                Suspension with Pay .................................................16

                Retaliation ...........................................................19

                Hostile Working Environment .................................24

VIII.   CONCLUSION ........................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Aman v. Cort Furniture Rental Corp.*,
   85 F.3d 1074 (3d Cir. 1996) ........................................................... 13, 20

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ...........................................................................5

*Armbruster v. Unisys Corp.*,
   32 F.3d 768 (3d Cir. 1994) ...............................................................16

*Bullock v. Children's Hosp.*,
   71 F. Supp. 2d 482 (E.D. Pa. 1999) ...................................................7

*Burlington N. & Santa Fe Ry Co., v. White*,
   548 U.S. 53 (2006) ...................................................................... 19, 21

*Chambers v. Sch. Dist. of Phila. Bd. of Educ.*,
   587 F.3d 176 (3d Cir. 2009) ...............................................................5

*Clark Cty. Sch Dist. v. Breeden*,
   532 U.S. 268 ( 2001) ........................................................................20

*Clowes v. Allegheny Valley Hospital*,
   991 F.2d 1159 (3d Cir. 1993) ...........................................................14

*Colwell v. Rite Aid Corp.*,
   602 F.3d 495 (3d Cir. 2010) .............................................................14

*Daniels v. Sch. Dist. of Phila.*,
   776 F.3d 181 (3d Cir. 2015) .............................................................23

*Davis v. Legal Services Alabama, Inc.*,
   No. 22-231 (U.S.C.A. 11th Cir.) ............................................. 17, 18, 19

*Fogelman v. Mercy Hosp. Inc.*,
   283 F.3d 561 (3d Cir. 2002) .............................................................23

*Fuentes v. Perskie*,
   32 F.3d 759 (3d Cir. 1994) ............................................................7, 8

*Goss v. Exxon Office Sys. Co.*,
   747 F.2d 885 (3d Cir. 1984) .............................................................13

*Harris v. Forklift Sys., Inc.*,
   510 U.S. 17 (1993)..................................................................................24

*Hill v. Borough of Kutztown*,
   45 F.3d 225 (3d Cir. 2006) ...................................................................15

*Int'l Bhd. of Teamsters v. U.S.*,
   431 U.S. 324 (1977)................................................................................6

*Jones v. S. Pa. Transp. Auth.*,
   796 F.3d 323 (3d Cir. 2015) ........................................................... 16, 17

*Kachmar v. SunGard Data Sys., Inc.*,
   109 F.3d 173 (3d Cir. 1997) ..................................................................23

*Lauren W. ex rel, Jean W. v. DeFlaminis*,
   480 F.3d 259 (3d Cir. 2007) ..................................................................23

*Lomando v. United States*,
   667 F.3d 363 (3d Cir. 2011) ....................................................................5

*Mandel v. M&Q Packaging Corp.*,
   706 F.3d 157 (3d Cir. 2013) ........................................................... 24, 25

*McDonnell Douglas Corp. v. Green*,
   411 U.S. 792 (1973)......................................................................... 6, 21

*Moore v. City of Phila*,
   461 F.3d 331 (3d Cir. 2005) ........................................................... 20, 24

*Orsatti v. New Jersey State Police*,
   71 F.3d 480 (3d Cir. 1995) ......................................................................5

*Pivirotto v. Innovative Sys.*,
   191 F.3d 344 (3d Cir. 1999) ....................................................................7

*Price Waterhouse v. Hopkins*,
   490 U.S. 228 (1989)................................................................................6

*Seeney v. Elwyn, Inc.*,
   409 F. App'x 570 (3d Cir. 2011) ................................................... 13, 14

*Trans World Airlines, Inc. v. Thurston*,
   469 U.S. 111 (1985)................................................................................6

*White v. Westinghouse Electric Co.*,
   862 F.2d 56 (3d Cir. 1988) ......................................................................5

*Woodson v. Scott Paper Co.*,
   109 F.3d 913 (3d Cir. 1997) .................................................................23


**Statutes & Other Authorities:**

28 U.S.C. § 1331 .................................................................................1

42 U.S.C. § 1981 ........................................................... 2, 4, 17, 19

42 U.S.C. § 1981(a) .........................................................................18

42 U.S.C. § 1981(b) .........................................................................18

42 U.S.C. § 2000e-2(a) ................................................................ 8, 20

42 U.S.C. § 2000e-2(a)(1) ...............................................................18

42 U.S.C. § 2000e-2(m) .....................................................................8

42 U.S.C. § 2000e-3(a) .....................................................................20

42 U.S.C. § 2000e-5(f)(1) ..................................................................2

42 U.S.C. § 2000e-5(f)(3) ..................................................................2

43 P.S. § 951 .....................................................................................2

*EEOC Enforcement Guidance on Retaliation and Related Issues*, 2 A. II. C
   (August 25, 2015) ...........................................................................21

Fed. R. App. P. 3 ...............................................................................1

Fed. R. App. P. 4 ...............................................................................1

Fed. R. Civ. P. 56(a)...........................................................................4

Pub L. 88-352, § 704, 78 Stat. 257 .................................................20

Third Circuit Appellate Rule 28.1 ......................................................4

**PLAINTIFF'S/APPELLANT'S BRIEF IN  SUPPORT OF HER APPEAL**

## I.      JURISDICTIONAL STATEMENT

This Court has jurisdiction over this appeal, which is from a final order issued by the Court below, dismissing all claims of Plaintiff Russo. Appx27.  Notice of appeal was timely filed pursuant to F.R.A.P 3 and 4. Notice was filed on  November 25, 2022. Appx28. The Court below had federal question jurisdiction pursuant to 28 U.S.C. 1331.

## II.     ISSUES FOR APPEAL

**1. Q Did the Court below commit error and abuse its discretion by dismissing Plaintiff's case at the summary judgment stage as opposed to allowing this matter to proceed to a jury?**

**Answer: Yes.**

## III.    STATEMENT OF RELATED CASES AND PROCEEDINGS

There are no related cases or proceedings in this matter.

## IV.    STATEMENT OF THE CASE PROCEDURAL BACKGROUND

This case was commenced on June 4, 2019 by the filing of a Complaint in the U. S. District Court for the Eastern District of Pennsylvania  against Plaintiff's former employer Bryn Mawr Bank Company.  The case was docketed at Case No. Civ-19-2408. Appx88.

1.      This civil rights case was brought pursuant to 42 U.S.C. § 1981, and Title VII of the Civil Rights Act of 1964., as amended, 42 U.S.C. § 2000e-5(f)(1) and (3). A pendent state law claim was made pursuant to the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. §951 *et seq.* Additionally, Appellant asserted common law claims for intentional infliction of emotional distress and being placed in a false light.

Defendant filed an Answer on August 8, 2019 and discovery proceeded.

On April 23, 2021, Defendant filed a Motion for Summary Judgment together with a "Statement of Undisputed Facts consisting of 151 paragraphs. Appx36, 64.

On May 21, 2021, Plaintiff filed a response thereto together with a Statement of Disputed Facts in Opposition (151 pars) and Statement of Disputed Facts (48 paragraphs ). Appx150. Defendant filed a reply on June 4, 2021.

On October 27, 2022 the Court below filed a Memorandum and Opinion followed by an Order dismissing all claims. Appx1, 27.

On November 25, 2022, Plaintiff filed a notice of an appeal with said appeal being docketed at Case No. 22-3235 in this Third Circuit Court of

Appeals, with Appellant subsequently filing the requisite case opening

information. Appx28.

## V.    SUMMARY OF ARGUMENT

The Court below committed error by dismissing the case

entirely in contravention of the standard to resolve all factual disputes and make all

reasonable inferences in Plaintiff's favor . Inexplicably, it took pains to

acknowledge that what Plaintiff had experienced was inexcusable. "To be clear,

the Court does not discredit Russo's feelings of offense, anger, or frustration, as

the conduct at issue in this case is entirely unprofessional. But employment law is

not a civility code and Russo has failed to put forth sufficient facts to defeat the

Bank's motion for summary judgment. Despite this, the Court's decision should

not be interpreted as condoning the Bank's or its employees' action." Appx26.

It is Plaintiff/ Appellant's position, (hereinafter "Appellant")  that the

civil rights laws indeed impose on employers a civility code and that the remedy

for the behavior that Appellant endured is provided for by those civil rights laws.

Appellant questions whether the Court below reviewed the

competing statements of facts, which showed factual disparities, as well as the

plausibility of Appellant's claims.   Instead, the Court itself weighed the evidence

and refused to allow the evidence, disputed or otherwise, to go to a jury, instead

dismissing all of Plaintiff's claims improperly as a matter of law.

## VI.    STANDARD OF REVIEW

In accordance with Third Circuit Appellate Rule 28.1, Federal Rule of

Appellate Procedure, Appellant asserts the following:

- That the court below abused its discretion;

- That the court below committed "plain error";

- That the court below engaged in fact finding that was clearly

  beyond its jurisdiction and erroneous;

As this case invoked the protection of  42 U.S.C. § 1981. and Title VII , the

District Court below had subject matter jurisdiction, such that this Third Circuit

Court has plenary jurisdiction.

## VII.   ARGUMENT

### A. STANDARD FOR SUMMARY JUDGMENT

Granting summary judgment is an extraordinary remedy. Summary judgment

may be granted only "if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

P. 56(a). "In determining whether such relief is warranted, '[t]he evidence of the

nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 181 (3d Cir. 2009) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). "The inquiry is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Id.* (*quoting Anderson*, 477 U.S. at 251-52). "A genuine dispute is one that 'may reasonably be resolved in favor of either party.'" *Lomando v. United States*, 667 F.3d 363, 371 (3d Cir. 2011) (*quoting Anderson*, 477 U.S. at 250). "A material fact is one 'that might affect the outcome of the suit under the governing law.'" *Id.* (*quoting Anderson*, 477 U.S. at 248).

In determining whether an issue of material fact exists upon summary judgment, the court must consider all evidence in the light most favorable to the non-moving party. *White v. Westinghouse Electric Co.*, 862 F.2d 56, 59 (3rd Cir. 1988). "[T]he court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the non-moving party." *Orsatti v. New Jersey State Police*, 71 F.3d 480, 482 (3rd Cir. 1995). Whenever a factual issue arises which cannot be resolved without a credibility determination, at this stage the Court must credit the non-moving party's evidence over that presented by the moving party. *Anderson*, 477 U.S. at 255.

5

Simply stated, the Court below has not adhered to these maxims and instead has erroneously deprived Appellant of a jury trial as Appellant has met the applicable factual thresholds.

**B. THERE IS SUFFICIENT EVIDENCE FOR A REASONABLE JURY TO FIND IN PLAINTIFF"S FAVOR ON HER DISCRIMINATION CLAIMS**

The "*McDonnell Douglas* framework" is a three-step burden-shifting test that was laid out by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under Title VII, a plaintiff must carry the initial burden of establishing a "prima facie case" of unlawful discrimination. *Id.* 411 U.S. at 802. The distinct method of proof in employment discrimination cases, which relies on presumptions and shifting burdens of articulation and production, arose out of the Supreme Court's recognition that direct evidence of an employer's motivation will often be unavailable or difficult to acquire. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 271 (1989) (O'Connor, J., concurring) ("The entire purpose of the *McDonnell Douglas* prima facie case is to compensate for the fact that direct evidence of intentional discrimination is hard to come by."); *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) ("The shifting burdens of proof set forth in *McDonnell Douglas* are designed to assure that the plaintiff has his day in court despite the unavailability of direct evidence.") (internal quotation marks omitted)); *see also Int'l Bhd. of Teamsters v. U.S.*, 431 U.S. 324, 359 n.45 (1977) (recognizing

that burden-shifting rules "are often created…to conform with a party's superior access to the proof").

In order to establish a prima facie case of discrimination under Title VII and the PHRA, Plaintiff must show that he or she: (1) is a member of a protected class; (2) was qualified for the position; and (3) suffered an adverse employment action under circumstances that give rise to an inference of discrimination. *Bullock v. Children's Hosp.*, 71 F. Supp. 2d 482, 487 (E.D. Pa. 1999). An "inference of discrimination" can be demonstrated in a multitude of ways, including replacement by someone outside of the protected class, less favorable treatment than similarly situated colleagues those outside the protected class, or other evidence or statements evincing discrimination, including statements or actions by her supervisor. *Id.*; *Pivirotto v. Innovative Sys.*, 191 F.3d 344 (3d Cir. 1999).

If the Plaintiff succeeds in establishing a prima facie case, the burden of production shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994) (citations omitted). The employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision. *Id.* A plaintiff survives summary judgment "by submitting evidence from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate

reasons (pretext); or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d 759 at 763. Title 42 U.S.C. §2000e-2(a), (m)  states that "[A]n unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice"

Simply, stated an examination of the respective factual statements filed by Appellant and Appellee demonstrate that Appellant more than adequately fulfilled her burden. Appx64 et seq and Appx150 et seq. So too does the testimony set forth beginning at each of Appx562, 774, 779 and 795.

### C.  AN EXAMINATION OF THE DECISION BELOW

On October 27, 2022 the Court below issued a Memorandum granting the Bank's  Motion for Summary judgment.  Appx1.  Yet, the facts raised below were hardly so one-sided or implausible as to justify summary judgment.

In the Memorandum's very first paragraph, the Court below simply summarizes Plaintiff/Appellant's allegations as follows:  that her supervisor "made numerous inappropriate and racist comments and regularly harassed and offended her throughout her tenure at the Bank"; "that Plaintiff claimed that she was discriminated against when the bank placed her on administrative leave following an investigation into a breach of security protocol"; and that "She also maintains

8

that, after a customer made inappropriate remarks that caused Russo to feel unsafe the Bank inappropriately gave the customer thirty days to close her account with the Bank rather than ending its relationship with the customer immediately.  Russo resigned the day after this incident and alleges she was constructively discharged, as opposed to doing so immediately and taking appropriate steps to protect the Plaintiff." Appx1.

This summary ignored the fact that what Appellant had established went to the heart of civil rights protections and what Appellant had undergone as set forth her in Statement in Opposition to Defendant's Statement of Facts and her own Statement of Disputed Facts. Appx150.

In point of fact, her counsel wrote to Defendant Bank's Chair setting forth some thirty incidents of racism and discrimination that she experienced. Appx119. Plaintiff testified that "She (Ms. Trainer) was very clear that her issues… were with black people…. She openly said that. She made reference to race all the time." Appx154 at par 30, Appx368. Further, she instructed Appellant to write up black tellers which Appellant brought to HR's attention. Appx175 at par 15. Appellant testified that the Bank  HR Department had dismissed her complaints with laughter stating that  Ms. Trainer "doesn't mean anything by it." Appx152 at par 13. Appellant was convinced that the Bank was looking for an excuse to fire

her, testifying that … Bryn Mawr Trust has a history of doctoring documents, of

pressuring their employees to deny what's going on. That from the CEO on down,

they have a pattern of behavior where they just cover up the wrongdoings and the

wrongdoers and they push people out when they try to stand up for what's right."

Appx171, 172 at par 5. Trainer told Appellant not to go over her head to Regional

Manager Laura Biernacki. Appx178 at par 31, Appx667, 668.  With Trainer's

racism amplified as a result of Ms. Bernacki's becoming Regional Manager,

Appellant complained "I am not a dog. I'm a human being." Appx178 at par5.

Despite her desire and determination to perform her work with dignity and

professionalism, her need to leave became inevitable due to the Bank's deliberately

tepid response to a racist, threatening and dangerous customer, referred to by

another employee as "crazy," who accosted Appellant. Appx82, pars 130, 133. It

was that lack of Appellee's support and protection that forced her to resign,

constituting constructive discharge.

## Constructive Discharge is a Factual Matter for a Jury

Appellant  maintains that her entire case should have been permitted to go to

the jury. Plaintiff feels that the Court below minimized the factual situation and

incorrectly decided against her as a matter of law, most particularly with respect to

her constructive discharge claim.

On its own, the Court below determined that Plaintiff failed to show "some causal nexus between her protected status and defendant's adverse treatment and that Appellant resigned merely because she was  "upset that a hostile customer was given thirty days to leave the Bank." Appx14.

In point of fact, she was afraid for her safety given indications that the racist and offending customer would return and given Appellant's past experience with racism at the Bank,  racism  all condoned by the Bank.  Much more was involved than simply terminating a customer relationship within the standard thirty days. Appellant testified as to her concerns over her physical safety, with her being by herself in the drive-through window lacking bullet-proof glass, and the lack of a nearby security guard. Appx166 at par 139, Appx412, 413.

As stated by Appellant in her emailed notice: " Instead of immediately terminating the Bank's relationship with this client who admitted to her reprehensible behavior and immediately instructing she [her] to stay away from me, you have allowed a situation where she can return to further harass me and remind me of what has transpired. At this point I am experiencing the same sort of symptoms that had me go to the emergency room not so very long ago, I can not continue to work in such an environment. Accordingly, I am terminating my employment relationship with the Bank immediately. Considering the

circumstances, I consider this constructive discharge as a result of the Bank's repeated failure to protect me and recognize my rights. Appx168 at par 147.   As testified to by a former bank branch manager, it would have taken three to five minutes to close out the customer. Appx176 at par 21, Appx777. Thirty days may have constituted "standard treatment", but it hardly showed "zero tolerance" for racism that the Bank touts. Appx176 at par 21.

 Further, as testified to, this was not Plaintiff's contemplated exist strategy. Instead, the racist and insulting customer, coupled with the Bank's inadequate response, precipitated her resignation. Her physical symptoms included chest pains and hair loss. Appx176 at par 20. By its reaction to this set of circumstances, the Bank achieved exactly what it wanted to achieve; namely, Plaintiff's termination from employment.

The Court determined that Appellant "fails to show how affording the customer time to close her accounts supports an inference of racial discrimination." Appx15. It was not about the thirty days to delist the client or whether the Bank was following customary practice. It was about Appellant's fear for her own safety given her race, prior experience with this customer, as well as the bank's tolerance for the racism, which Appellant had experienced previous to and contemporaneously with this situation.

Appellant  was  literally in tears the entire time that she met with HR on this and specifically stated that she did not feel safe. Appx134, Appx572-574. Consistent with Appellee's tolerance of racism, it  would not even acknowledge the obvious; that the blatantly offending customer was racist. Appx179 at par 35.

Appellant met the constructive discharge standard by demonstrating that Appellee's conduct made "working conditions so unpleasant or intolerable that a reasonable person in the employee's shoe would resign." Appx12 citing *Heredia-Caines,* 580 F. Supp. 3d at 128, quoting *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1084 (3d Cir. 1996)

 Moreover, the constructive discharge doctrine applies without regard for whether the employer had a specific intent to bring about a discharge. The court need merely find that the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign. *Goss v. Exxon Office Sys. Co*., 747 F.2d 885 ,888 (3rd Cir. 1984)  These conditions of intolerable discrimination are the very instances of racism that the Court below was claiming it did not condone.

The Court below, at Appx13, relies on *Seeney v. Elwyn, Inc*. 409 F. App'x 570, 573 (3d Cir. 2011 for various factors Courts consider a number of factors in determining whether an employee was forced to resign, including whether (1) she

was threatened with discharge; (2) she was encouraged to resign; (3) she was demoted or suffered a reduction in pay or benefits; (4) she was involuntarily transferred to a less desirable position; (5) her job responsibilities were altered; and (6) she began receiving unsatisfactory job evaluations. *See Clowes v. Allegheny Valley Hospital*, 991 F.2d 1159, 1161 (3d Cir. 1993). *See also Colwell v. Rite Aid Corp.*, 602 F.3d 495, 502-03 (3d Cir. 2010).  It should be noted that the factors relied on by the Court had nothing to do with the actual circumstances of Appellee's inaction in the face of Appellant's concern over her physical safety and race. Moreover, *Seeney* did not establish an exclusive set of factors, but instead merely set forth examples.

 The Court below decided to justify its decision based on the Bank's supposedly neutral  standard policy when it came to delisting clients. Instead it was obvious that Appellant's race and personal safety went to the heart of her constructive discharge claim.

Given Appellant's history of being the recipient of racism and the plethora of incidents cited (Pltf's SMF  in Opposition,  at pars 8, 9, 12, 24 , 29, 46, 48, 49, 75, 78, 81, 97, 98,106 amongst others and Pltf's SDFs at pars15, 21, 23, 26, 27, 28, 29, 36, 38, 39, 47 all at Appx150),  the very history which the Court below would not condone, the Court should have deferred from ruling against Appellant and

instead let the matter proceed for the jury to determine whether there was a constructive discharge.

The factual differences between Appellant and Appellee regarding the circumstances that prompted Appellant's resignation could not have been any clearer. As stated by this Court in *Hill v. Borough of Kutztown*, 45 F.3d 225, 232 (3d Cir. 2006) "The issue of whether a Plaintiff was constructively discharged is necessarily a 'fact intensive question' that should appropriately be addressed by the finder of fact." Here a jury was deprived of its role as finder of fact.

Appellee consistently minimized Appellant's expressed racial concerns. As testified to by Plaintiff "Those who complain about race find that it falls on deaf ears, turning the complainant into a problem and a fact for exposing a problem that Defendant does not want to deal with." Appx174 at par 10. Appellant's manager made it clear that she did not want to hear any of Appellant's complaints and that instead of rectifying the problems 'they basically tried to get me fired." Appx163, at par 106, Appx440, 441.

The undersigned finds it simply disingenuous for the Court below to make the decision to award summary judgment while stating the applicable standard that " In reviewing the record 'a court must view the facts in the light most favorable

to the nonmoving party and draw all inferences in that party's favor.' *Armbruster v. Unisys Corp*., 32 F.3d 768, 777 (3d Cir 1994)" The facts were not so interpreted.

<u>Suspension with Pay</u>

The Court below noted that an internal investigation was opened regarding a box containing combinations to the Bank's coin vault which was taped shut prompting the Bank's placing Appellant on paid administrative leave. Appx3. As noted by the Court below, Appellant felt that she was " humiliated and denigrated in front of customers….. and that the entire incident was a set up in retaliation for making complaints about her racial treatment." Appx4.

The Court below held that paid administrative leave is not a materially adverse employment action.  It stated that an adverse employment action is an "action by an employer that is serious and tangible enough to alter an employee's compensation, terms conditions, or privileges of employment" citing *Jones v. S. Pa. Transp. Auth.*  796 F.3d 323,326 (3d Cir. 2015). Appx11.  Focusing simply on the fact that Appellant continued to be paid, fails to acknowledge Appellant's contention that this entirely retaliatory and empty investigation was simply a pretext (in addition to substantiating her retaliation and hostile work environment claims).

The Court below ignores the fact that by definition, a security based investigation certainly altered the conditions of Appellant's employment, placing her in a false light. Appellant felt that it communicated to others that she was not trustworthy (Appx159 at par 78) and placed her in a false light. Appx160 at par 8. See also Appx177 at par 26, Appx178 at pars 27,29.

Furthermore, the Court below ignores the portion of *Jones* that it quotes

" ' the terms and conditions of employment ordinarily include the possibility that an employee will be subject to an employer's disciplinary policies in appropriate circumstances.'" *Id* . However, there was nothing "appropriate" here. Moreover, the Court below notes that "where a plaintiff can show something 'more', however suspension with pay may constitute an adverse employment action."  The Appellant can and in fact has shown something more, as  this was not an ordinary circumstance, but instead a humiliating pretextual retaliation, a setup, without suitable basis, playing out before customers. Appx177 at par 26. Those circumstances,  a jury should have been permitted to consider.

Significantly, this  matter of paid suspension is presently before the Supreme Court of the United States in, Inc *Davis v. Legal Services Alabama*, *Inc.* No 22-231 as to whether Title VII  of the Civil Rights Act and Section 1981 prohibit discrimination as to all "terms," "conditions," or "privileges " of employment, or

are limited to "significant" discriminatory employer actions only.  Cert comes from

a decision of the US Court of Appeals for the Eleventh Circuit which on December

2, 2021 upheld a District Court's grant of summary judgement on the issue of a

paid suspension . "More specifically, the court held both that being placed on paid

leave was not an adverse employment action and that Davis had not raised a fact

issue on his claim that he had been constructively discharged." *Davis v. Legal

Services Alabama, Inc*, ( USCA for the 11th Cir. at 5).

The exact language in the Petition for Cert to the U.S. Supreme Court is as

follows:

QUESTION PRESENTED: Title VII of the Civil Rights Act of 1964 makes

it unlawful for an employer "to fail or refuse to hire or to discharge any

individual, or otherwise to discriminate against any individual with respect

to" the person's "compensation, terms, conditions, or privileges of

employment" on the basis of race, color, religion, sex, or national origin. 42

U.S.C. § 2000e-2(a)(1). Section 1981 of Title 42 provides "[a]ll persons" in

the United States "the same right" "to make and enforce contracts" as is

"enjoyed by white citizens," including "the enjoyment of all benefits,

privileges, terms, and conditions of the contractual relationship." 42 U.S.C.

§ 1981(a)-(b). The Eleventh Circuit held below that these prohibitions do not

bar an employer from suspending an employee with pay because of his race.

18

In its view, an employer who suspends an employee because he is Black is liable only if the suspension results in a loss of pay or is "similarly significant." The question presented is: Do Title VII and Section 1981 prohibit discrimination as to all "terms," "conditions," or "privileges" of employment, or are they limited to "significant" discriminatory employer actions only?

<u>Retaliation</u>

It is important to note that the 11thCircuit Court in *Davis* stated that " We have previously acknowledged that paid suspension may constitute an adverse employment action in the retaliation context. 'The standard to show an adverse employment decision in a retaliation case is more relaxed, with the employee having to show only that the mistreatment 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N. & Santa Fe Ry Co., v. White*, 548 U.S. 53,68 (2006). Simply stated, Appellant has met that relaxed standard, not simply with respect to her suspension, but with respect to the entirety of her retaliation claims.

Title VII of the Civil Rights Act of 1964, forbids employment discrimination against "any individual" based on that individual's 'race, color,

religion, sex or national origin. Pub L. 88-352, Section 704, 78 Stat. 257, as amended, 42 U.S.C. Section 2000e-2(a).

A separate section of the Act, its anti-retaliation provision, forbids an employer from discriminat[ing] against' an employee or job applicant because that individual opposed any practice made unlawful by Title VII or made a charge, testified, assisted, or participated in' a Title VII providing or investigation. Section 2000e-3(a)"

Moreover, Title VII's antiretaliation provision protects individuals who have an objectively reasonable, good faith belief that the conduct they oppose violates the statute. See *Moore v. City of Phila*, 461 F.3d 331,341 (citing *Clark Cty. Sch Dist. v. Breeden*, 532 U.S. 268, 271 ( 2001)

Pursuant to this Court's precedential decisions, an employee claiming retaliation " need not prove the merits of the underlying discrimination complaint, existed. " *Aman v. Cort Furniture Rental Corp.,* 85 F.3d 1074, 1085 (3d Cir.1996 ) As the EEOC has explained, " a retaliation claim based on opposition is not defeated merely because the underlying challenged practice ultimately is found to be lawful," and it is sufficient for the complaining employee to hold a "reasonable good faith belief that the conduct opposed violates the EEO laws, or could do so if

repeated." *EEOC Enforcement Guidance on Retaliation and Related Issues*, 2 A.

II. C (August 25, 2015)

Simply stated, the Supreme Court in *Burlington* made a distinction which

the Court below ignored when it comes to retaliation.

Further, the *Burlington* Court stated " There is strong reason to believe that

Congress intended the differences that its language suggests, for the two provisions

differ not only in language but in purpose as well. The anti-discrimination

provision seeks a workplace where individuals are not discriminated against

because of their racial, ethnic, religious, or gender-based status. See *McDonnell*

*Douglas v. Green* 411 U.S. 792, 800-801 (1973)  The anti-retaliation provision

seeks to prevent injury to individuals based on who they are, *i.e.*, their status. The

anti-retaliation provisions seeks to prevent harm to individuals based on what they

do. *i.e.,* their conduct."

On the matter of retaliation, here the Court below notes that " Russo asserts

several purported retaliatory actions the Bank took after she complained about

Trainer to Fryer (HR) and Biernacki and she filed her formal complaint with the

EEOC and PHRC in April 2018. Russo argues that the unlocked 'vault/ key box

accusation… was a set up in retaliation for [her] racial complaints. Appx177 at par

26 She also claims that the Bank retaliated against her when she was allegedly

pressured to stop the newspaper story regarding the Bank from going forward and

when the Bank did 'not protect[] [her] and purposefully g[ave] the offending

customer the courtesy of thirty days instead of an immediate demarketing.'"

Appx19.

This is the sum and substance of the lower Court's factual summary when

Plaintiff's Statement of Disputed Facts in Opposition and Plaintiff's Statement of

Disputed Facts provide a great deal more in the way of factual opposition than the

Court's gloss quoted above. Without citing each and every provision of 151

statements of disputed facts in opposition and 48 statements of disputed facts,

Appellant makes specific reference thereto for this court's consideration. Appx150.

Included therewith is HR Representative Jennifer Stryker threatening

Plaintiff/Appellant that it would be "bad for her" to speak to the newspaper about

an upcoming article on her case. Appx163 at par 106, Appx177 at par 24. Also, her

regional manager instructed her to stop calling her about the racist attacks by Ms.

Trainer. Appellant was emphatic that the Bank was consistently trying to get her

tripped up and fired. Appx163 at par 106. The vault key incident has already been

cited as being a retaliatory setup as confirmed by a co-worker. Appx177 par 26.

Moreover, Appellant testified that as a result of going to HR she was threatened,

called a liar, and retaliated against. Appx177 at par 25.

To establish a prima facie case of retaliation under Title VII and the PHRA, a plaintiff must show:1) a protected employee activity; 2) adverse action and a causal connection between the employee's protected activity and the employer's adverse action  *Fogelman v. Mercy Hosp. Inc.*, 283 F.3d 561, 567-68  (3d Cir. 2002 ).  Appellee did not contest the first prong, i.e., that Appellant engaged in protected activity by reporting discrimination. To satisfy the second prong, "the plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Daniels v. Sch. Dist. of Phila.,* 776 F.3d 181, 195 (3d Cir. 2015) To satisfy the third prong, a plaintiff a may establish causation by relying on "an unusually suggestive temporal proximity between the protected activity and the alleged retaliatory action," "a pattern  of antagonism, coupled with timing," or evidence gleaned from the record as a whole*." Lauren W. ex rel, Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)

Further, this Circuit has held that " It is important to emphasize that it is causation, not temporal proximity itself, that is an element of plaintiff's prima facie case, and temporal proximity merely provides an evidentiary basis from which an inference can be drawn." *Kachmar v. SunGard Data Sys., Inc*., 109 F.3d 173, 178, (3d Cir 1997 ); See *Woodson v. Scott Paper Co*., 109 F.3d 913, 921 (3d. Cir 1997)

(finding a sufficient causal connection based on a "pattern of antagonism: during the two year period between the protected activity and the adverse action. ) The element of causation in retaliation cases " is highly context-specific." *Moore v. City of Phila*, 461 F.3d 331,352 (3d Cir. 2005)

Simply stated, the Court below ignored the widely disputed facts and imposed an arbitrary one year time frame when competing claims should have been allowed to pass on to a jury for a decision.

## Hostile Working Environment

The Court takes care to cite the applicable standard  with respect to a hostile working environment: "To determine whether such an environment exists, 'a court must consider the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Mandel v. M&Q Packaging Corp*., 706 F.3d 157,168 (3d Cir. 2013) (quoting *Harris v. Forklift Sys., Inc.* 510 U.S. 17,23 (1993). Appx20.

The Court then cites the different applicable statute of limitations for  Title VII and the PHRA and notes the availability of what is known as the "continuing violation doctrine." "To invoke the continuing violation doctrine, ' the plaintiff

must show that all acts which constitute the claim are part of the same unlawful employment practice and that at least one act falls within the applicable limitations period.'" *Mandel,* 706 F.3d 157,165-166 (3ʳᵈ Cir. 2013). Appx21. Clearly, the Appellant has done so.

However, the Court departs from the proper considerations by claiming that the only conduct that could be the basis for a hostile environment claim is Ms. Trainer's statement that "she was tired of Black people complaining and acting like victims, in February , 2018. Appx23, Appx154 at par. 30. The Court below, improperly as a matter of law, dismisses this racist diatribe as a mere utterance of offensive feelings or mere discourtesy or rudeness. Moreover, it chooses to ignore what preceded that utterance, which clearly constituted part and parcel of a continuing violation. The Court below states that Appellant identified several inappropriate statements related to race that Trainer made over the course of roughly two years, as well as other conduct she found objectionable. The Court concludes however, that "Although undoubtably offensive, problematic, and misplaced, even taken as a whole these acts do not rise to the level of being sufficiently severe or pervasive to establish a *prima facie* case of hostile work environment." Appx24.

The Court ignores a virtual mountain of evidence as to hostile environment, partially summed up in Appellant's counsel's letter citing thirty disgusting

incidents of discrimination. Appx76 and 77 at par 92, Appx173 at par 7, all of which was swept under the rug, or casually dismissed by HR. Appx174, at par 10, Appx179 at par 39. As Appellant testified, when it involves the Bank, it's never about race, it's just "inappropriate". Appx180 at par 46. Appellant testified that during her entire tenure at the Bank, it never made a finding of discrimination. Appx173 at par 36. Notably, Appellant testified as to the overall clear difference in treatment between white employees and black employees. Appx173 at par 8, Appx179 at par 9.

The Court below dismisses Appellant's hostile work environment claims as being "neither physically threatening nor humiliating and would not reasonably interfere with work performance." Appx26.  However, this was a plausible and factually-based contention put forth by Appellant;  clearly something that should have instead been considered by a jury, which could  determine whether the work environment's characteristics  were severe or pervasive enough to alter the terms and conditions of her employment.

VIII    Conclusion

Again, it bears emphasizing that  the lower Court's  disclaimer is in and of itself a telling statement in support of reversal: "To be clear, the Court does not discredit Russo's feelings of offense, anger, or frustration as the conduct at issue is

this case is entirely unprofessional. But employment law is not a civility code and Russo has failed to put forth sufficient facts to defeat the Bank's motion for summary judgment.  Despite this, the Court's decision should not be interpreted as condoning the Bank's or its employees' action."

To the contrary  Appellant contends that the civil rights laws were create to impose a civility code, providing therein a remedy for the disgusting behavior that Appellant endured.

An examination of the parties' statements of facts demonstrates that enough pertinent plausible facts were put forth to allow this matter to proceed to the jury's consideration so that Appellant could have an opportunity to be afforded justice under the law.

Respectfully submitted,

/s/: Mark D. Schwartz
MARK D. SCHWARTZ, ESQUIRE
PA I.D.#30527
P.O. Box 330 24
Bryn Mawr, PA  19010
Telephone No.:  610.525.5534
Email:  markschwartz6814@gmail.com

Counsel for Plaintiff/Appellant
Wandrea Russo

Dated:  May 12, 2023

## **CERTIFICATION OF ADMISSION TO BAR**

I Mark D. Schwartz certify as follows:

1.      I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

2.      Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

Respectfully submitted,

*/s/: Mark D. Schwartz*
MARK D. SCHWARTZ, ESQUIRE
PA I.D.#30527
P.O. Box 330 24
Bryn Mawr, PA  19010
Telephone No.:  610.525.5534
Email:  markschwartz6814@gmail.com

Counsel for Plaintiff/Appellant
Wandrea Russo

Dated:  May 12, 2023

## CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(a) AND LOCAL RULE 31.1

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify the following:

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because this brief contains 5,834 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii) of the Federal Rules of Appellate Procedure.

This brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because this brief has been prepared in a proportionally spaced typeface using the 2008 version of Microsoft Word in 14 point Times New Roman font.

This brief complies with the electronic filing requirements of Local Rule 31.1(c) because the text of this electronic brief is identical to the text of the paper copies, and the Vipre Virus Protection, version 3.1 has been run on the file containing the electronic version of this brief and no viruses have been detected.

Dated: May 12, 2023

Respectfully submitted,

*/s/: Mark D. Schwartz*

## CERTIFICATE OF FILING AND SERVICE

I, Noel Reyes, hereby certify pursuant to Fed. R. App. P. 25(d) that, on

May 12, 2023, the foregoing Brief and Appendix for Plaintiff-Appellant was filed

through the CM/ECF system and served electronically.

Unless otherwise noted, seven copies will be filed with the Court within the time

provided in the Court's rules via Overnight Fed Ex Delivery.


/s/ Noel Reyes
   Noel Reyes

"APPENDIX I"

i

# TABLE OF CONTENTS

**Page**

**Volume 1:**

Memorandum and Opinion, dated
    October 27, 2022 .................................................... Appx1

Order, dated October 27, 2022 .................................. Appx27

Notice of Appeal, dated November 25, 2022 ............. Appx28

**Volume 2:**

U.S. District Court Docket Entries ........................... Appx30

Notice of Motion by Defendant, for an Order
    granting Summary Judgment, dated
    April 23, 2021 ....................................................... Appx36

Memorandum of Law for Defendant, in Support of
    Motion, dated April 23, 2021 ................................ Appx38

Statement of Undisputed Material Facts, dated
    April 23, 2021 ....................................................... Appx64

Proposed Order .......................................................... Appx87

**<u>Defendant's Exhibits:</u>**

    Exhibit 4 – Complaint, dated June 4, 2019 ............ Appx88

**<u>Plaintiff's Exhibit:</u>**

    Exhibit 1102 – Letter from Mark D. Schwartz to
    Britton H. Murdoch, dated May 16, 2018 ............. Appx119

Memorandum of Law by Plaintiff in Opposition to
    Motion, dated May 21, 2021 .................................. Appx126

ii

**Page**

Plaintiff's Statement of Disputed Facts in
    Opposition to Defendant's Statement of
    Undisputed Material Facts, dated May 21, 2021 ... Appx150

Exhibit 1 to Memorandum –
(i) Deposition Transcript of Wandrea Russo,
    dated October 26, 2020......................................... Appx182

**Volume 3:**

(ii) Deposition Transcript of Wandrea Russo,
    dated February 24, 2021 ....................................... Appx562

(iii) Excerpts of Deposition Transcript of Franz T.
    Excellent, dated February 5, 2021 ........................ Appx774

(iv) Excerpts of Deposition Transcript of Linda
    Sanchez, dated January 12, 2021 .......................... Appx779

(v) Excerpts of Deposition Transcript of Karen
    Stevens, dated October 28, 2020 .......................... Appx795

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **WANDREA RUSSO,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **THE BRYN MAWR TRUST COMPANY,** | : | **No. 19-2408** |
| **Defendant.** | : | |

<u>**MEMORANDUM**</u>

**Schiller, J.**                                                                   **October 27, 2022**

      Plaintiff Wandrea Russo worked for Defendant The Bryn Mawr Trust Company (the "Bank") from 2014 until May 23, 2019. She alleges her former supervisor, Therese Trainer, made numerous inappropriate and racist comments and regularly harassed and offended her throughout her tenure at the Bank. Russo claims she was discriminated against when the Bank placed her on administrative leave following an investigation into a breach of security protocol. She also maintains that, after a customer made inappropriate remarks that caused Russo to feel unsafe, the Bank inappropriately gave the customer thirty days to close her account with the Bank rather than ending its relationship with the customer immediately. Russo resigned the day after this incident and alleges she was constructively discharged. She asserted claims for employment discrimination, retaliation, hostile work environment, and intentional infliction of emotional distress under applicable federal and state law. The Bank filed a motion for summary judgment on all claims. For the reasons that follow, the Bank's motion is granted.

## I.   <u>BACKGROUND</u>

      Russo is an African American woman who was originally hired as the Assistant Head Teller of the Bank's Bryn Mawr branch location on October 20, 2014. (Def.'s Statement of Undisputed Material Facts [Def.'s SUMF] ¶¶ 1-2.) She was promoted to Head Teller of that branch

1

```
Appx1
```

in January 2015 and then became the Head Teller of the Bank's primary branch location in February 2016. (*Id.* ¶¶ 3-4.)

### A.  Issues with Therese Trainer

Starting in 2015, Russo's supervisor was Therese Trainer, who is white. (Compl. ¶ 10.) Russo claims that while working under Trainer, Trainer routinely made inappropriate and racist comments and "there was a clear difference in treatment between white employees and black employees." (Pl.'s Statement of Disputed Facts [Pl.'s SDF] ¶ 8.) For example, Russo testified that Trainer: made insensitive comments about Donald Trump's candidacy during the 2016 presidential election; stated that "black people don't know how to budget" and that if "they knew how to budget, then they would . . . be Republicans"; and remarked that she did not like Russo's winter boots, which Russo believed was racially motivated. (Def.'s SUMF ¶¶ 12, 14.) Trainer made several other comments regarding race, such as:

- Stating, in 2016, that she was "tired of black people complaining about slavery" and that "they forced Irish slave women to sleep with black slaves in order to create a stronger slave" (*Id.* ¶ 16; Pl.'s Statement of Disputed Facts in Opp. to Def.'s Statement of Undisputed Material Facts [Pl.'s SDF in Opp.] ¶ 16);
- During the 2016 Summer Olympics, suggesting to a Jamaican Bank employee that he should be able to move quickly because "Jamaicans are fast" (Def.'s SUMF ¶ 20; Pl.'s SDF in Opp. ¶ 20);
- Telling Russo that because she was "a big black woman," she should not be afraid of "a little old white lady" who was becoming angry with Russo in either 2016 or 2017 (Def.'s SUMF ¶ 23; Pl.'s SDF in Opp. ¶ 23);
- Inviting Russo to attend an anti-abortion meeting in March 2017 "because most aborted babies are aborted by black women" (Def.'s SUMF ¶ 25; Pl.'s SDF in Opp. ¶ 25); and
- Stating, in February 2018, that "she was tired of Black people complaining and acting like victims." (Def.'s SUMF ¶ 30; Pl.'s SDF in Opp. ¶ 30.)

Trainer also made it difficult for Russo to schedule a PTO day in February 2018. (Def.'s SUMF ¶¶ 32-34.)

Appx2

On April 25, 2018 Trainer told Russo that she had to drive to another branch, pick up another Bank employee, and transport him with various coins. (*Id.* ¶ 48; Pl.'s SDF in Opp. ¶ 48.) Russo stated that she did not feel comfortable with this request and refused to do so. (Pl.'s SDF in Opp. ¶¶ 49, 51; Def.'s SUMF ¶¶ 49, 51.) On that same day, Trainer assigned origination credit for a customer's new credit card application to another teller, but Russo felt that it should have been attributed to her. (Def.'s SUMF ¶ 42.) Russo complained about this to Nicola Fryer (in HR), and when she learned "she would not get credit for the credit card sale, Russo left the branch, claiming she was not feeling well." (*Id.* ¶¶ 46-47; Pl.'s SDF in Opp. ¶¶ 46-47.) She did not return to work until April 30, 2018. (Def.'s SUMF ¶ 54.)

During February, March, and April 2018, Russo met with Fryer and Regional Manager Laura Biernacki to report Trainer's conduct and statements. (*Id.* ¶¶ 30, 35.)

**B. Security Incident and Administrative Leave**

On April 27, while Russo was away from the Bank, Assistant Manager Cathy Brown-Hinton discovered that a box containing combinations to the Bank's coin vault was taped shut rather than locked. (*Id.* ¶ 55; *see also* Def.'s Ex. 241.) The Bank opened an internal investigation into this incident. (Def.'s SUMF ¶ 60.) During the investigation, Shakeena Wilson, another teller, "reported that she and Russo had gone into the vault about a month before (i.e. in mid-April) and discovered that the key to the combination box was missing and the box was open, and together they taped the box shut." (*Id.* ¶ 61.) The investigation also revealed that Russo previously gave a new employee the keys to another teller's cash box.[1] (*Id.* ¶ 58; *see also* Def.'s Ex. 241.)

---

[1]    A few weeks later, Russo reported to HR (rather than the Bank's security team) that a separate key was left out in a bowl rather than placed in a key box. (Def.'s SUMF ¶¶ 67-68; Def.'s Ex. 240.) The Bank also investigated this and determined that there was no security issue with respect to this key because it did not open drawers or vaults containing cash. (Def.'s SUMF ¶ 70; Def.'s Ex. 240.)

Appx3

On May 25, 2018, Biernacki and Fryer met with Russo to share the investigation's findings. (Def.'s SUMF ¶ 72.) Russo was placed on paid administrative leave following the meeting and her keys were confiscated before she left the branch. (*Id.* ¶¶ 75, 78.) Russo believes that, although it could be appropriate to take keys away from a suspended employee, she "was humiliated and denigrated in front of customers when she was required to turn over her keys." (Pl.'s SDF in Opp. ¶ 78; *see also* Def.'s SUMF ¶ 78; Pl.'s SDF ¶ 29.) She also acknowledged that taping the key box shut rather than locking it could warrant termination. (Def.'s SUMF ¶ 76; Pl.'s SDF in Opp. ¶ 76.)

Russo's leave was extended so the Bank's investigation team could review security footage of the vault, but the Bank was unable to recover the video. (Def.'s SUMF ¶ 75.) Although Russo notified the Bank that there was initially a discrepancy in her pay while she was suspended, she ultimately received her full pay. (*Id.* ¶ 87; Pl.'s SDF in Opp. ¶ 87.) Upon her return from leave, her pay was not reduced and her responsibilities were unchanged. (Def.'s SUMF ¶ 82; Pl.'s SDF in Opp. ¶ 82.) She nevertheless alleges that this entire incident "was a set up in retaliation for" making complaints about Trainer. (Pl.'s SDF ¶ 26.)

### C.   Russo's Formal Complaints and the Bank's Investigation

On April 29, 2018—four days after Russo left the Bank because she was not feeling well—she filed a formal complaint with the Equal Employment Opportunity Commission ("EEOC") and Pennsylvania Human Rights Commission ("PHRC"). (Def.'s SUMF ¶¶ 11, 46-47; Pl.'s SDF in Opp. ¶¶ 11, 46-47.) Her attorney later sent a letter dated May 16, 2018 to the Bank's Board detailing thirty alleged incidents of discrimination and harassment. (Def.'s SUMF ¶ 92; Pl.'s SDF in Opp. ¶ 92; Pl.'s SDF ¶ 7.) Among these were Trainer's comments related to slavery, Jamaicans running quickly, abortions, and the 2016 presidential election, as well as other instances of Trainer

4

Appx4

criticizing and belittling Russo. (Def.'s SUMF ¶¶ 93-94; *see also* Russo Ex. 2.) For instance, the letter recounts Trainer requiring Russo to process her own referral paperwork, hypothetically asking Russo whether she has a brain, suggesting that Russo buy clothes at a thrift shop, telling Russo not to leave the building during her lunch break, and scolding Russo for failing "to plan for the unknown." (*See* Russo Ex. 2.)

The Bank investigated these allegations and sent Russo a copy of its findings on June 20, 2018. (Def.'s SUMF ¶¶ 95, 97; *see also* Def.'s Ex. 108.) The Bank explained that it "interview[ed] several individuals who [Russo] indicated specifically witnessed certain events, as well as Therese Trainer[,] who is the subject of [Russo's] complaint," but the Bank did "not conclude[] that discrimination or harassment occurred." (Def.'s Ex. 108.) However, the Bank "learned information about the day-to-day operations of the branch which [it] intend[ed] to address" by, for example, "reminding all employees about the anti-harassment policies of the Bank and providing additional training to managers and employees." (*Id.*)

### D. Russo's Return from Administrative Leave and Departure from the Bank

Upon Russo's return from administrative leave, HR Representative Jennifer Stryker met with Russo on June 22, 2018 to discuss her transition back to the branch. (Def.'s SUMF ¶ 101; Pl.'s SDF in Opp. ¶ 101.) Stryker also asked whether Russo was aware that the Bank received a call from a reporter regarding a local newspaper's investigation concerning Russo's allegations. (Def.'s SUMF ¶ 103; Pl.'s SDF in Opp. ¶ 103.) According to Russo, Stryker attempted to pressure Russo to tell the reporter not to write the article by saying it would be "bad" for Russo if the story were published. (Pl.'s SDF ¶ 24; Pl.'s SDF in Opp. ¶ 106.) The Bank maintains it did not try to discourage Russo from going forward with the article, which was eventually published. (Def.'s SUMF ¶¶ 105, 111.)

5

In June 2018, Trainer left the Bank's Bryn Mawr branch and was replaced by Cindy Yovanov. (Def.'s SUMF ¶¶ 100, 116; Pl.'s SDF in Opp. ¶¶ 100, 116.) Several months later, in February 2019, Russo told a co-worker that she was "planning [her] exit strategy" with her attorney so she could "be out by April at the latest." (Def.'s SUMF ¶ 114; *see also* Pl.'s SDF in Opp. ¶ 114.) She testified that she needed to leave her position at the Bank "[b]ecause it was affecting [her] health and [she] was stressed and [she] just didn't feel like [she] could take it any longer." (Def.'s SUMF ¶ 115 (quoting Russo Dep. at 126:14-18); *see also* Pl.'s SDF in Opp. ¶ 115.) Around the same time, Russo complained to Yovanov that she believed Yovanov was discriminating against her and retaliating against her in response to her filing a claim with the EEOC and PHRC by suggesting that Russo apply for a promotion in light of Russo's "repeated[]" resistance to "being pushed into another position and being referred to in the past tense in regards to [her] current position." (Def.'s Ex. 182; *see also* Def.'s SUMF ¶ 116; Pl.'s SDF in Opp. ¶ 116.) Yovanov was "confused and surprised" by this accusation and left it up to Russo to decide whether she wanted "to take advantage of the opportunity" for a promotion. (Def.'s Ex. 182.) Russo continued to oppose a promotion and remained in her role. (*Id.*)

On May 22, 2019, Russo emailed Yovanov, HR representatives, Biernacki, and the Bank's CEO regarding an interaction she had earlier that day with a hostile customer. (Def.'s SUMF ¶ 127; Pl.'s SDF in Opp. ¶ 127; Def.'s Ex. 209.) The customer, who Russo recognized from prior interactions, made inappropriate comments about abortion, race, and religion while Russo helped her at the drive-thru window. (Def.'s SUMF ¶¶ 128-30, 134; Pl.'s SDF in Opp. ¶¶ 128-30, 134; Def.'s Ex. 209.) Russo wrote that the customer was "clearly unstable" and the customer "offended" her. (Def.'s SUMF ¶¶ 129-30; Pl.'s SDF in Opp. ¶¶ 129-30; Def.'s Ex. 209.) She stated she would

6

refuse to help the customer in the future and demanded the Bank act in response to this incident. (Def.'s SUMF ¶ 130; Pl.'s SDF in Opp. ¶ 130; Def.'s Ex. 209.)

Within an hour, the Bank's Chief HR Officer, Linda Sanchez, reached out to Russo and the two met in person later that day with another HR Representative, Corey Crapella. (Def.'s SUMF ¶¶ 131-32; Pl.'s SDF in Opp. ¶¶ 131-32; Def.'s Ex. 209.) Russo recounted the incident to Sanchez and Crapella, who told Russo they would follow up with her within a day or two. (Def.'s SUMF ¶¶ 133-35; Pl.'s SDF in Opp. ¶¶ 133-35.) The next day, Sanchez and Crapella met with Russo and informed her that they spoke to the customer, who corroborated Russo's account of the events. (Def.'s SUMF ¶¶ 137-38; Pl.'s SDF in Opp. ¶¶ 137-38; Def.'s Ex. 211.) Sanchez stated that based on this incident, the Bank decided to end its relationship with the customer (or "de-market" the customer). (Def.'s SUMF ¶ 139; Pl.'s SDF in Opp. ¶ 139; Def.'s Ex. 211.) Pursuant to the Bank's standard de-marketing policy, the customer would be afforded thirty days before her account was officially closed so she could find a new financial institution, transfer her funds, update account information for any direct deposits and automatic withdrawals, and perform other tasks to prepare for the termination of her relationship with the Bank. (Def.'s SUMF ¶¶ 139-41; Def.'s Ex. 211.) Finally, Sanchez explained that if the customer returned to the branch, Russo did not need to assist her. (Def.'s SUMF ¶ 139; Pl.'s SDF in Opp. ¶ 139; Def.'s Ex. 211.)

At some point after that meeting ended, Russo handed her badge and keys to Yovanov and resigned from the Bank. (Def.'s SUMF ¶ 146.) In an email she sent to HR and Yovanov later that night, Russo explained that she resigned because the Bank did not immediately terminate its relationship with the customer. (Def.'s SUMF ¶ 147; Pl.'s SDF in Opp. ¶ 147; Def.'s Ex. 212.) She felt that the Bank created "a situation where [the customer] can return to further harass [her] and remind [her] of what has transpired." (Pl.'s SDF in Opp. ¶ 147; Def.'s Ex. 212.) She

"consider[ed] this constructive discharge as a result of the Bank's repeated failure to protect [her] and recognize [her] rights." (Pl.'s SDF in Opp. ¶ 147; Def.'s Ex. 212.)

### E. **Procedural History**

As noted above, Russo filed a complaint with the EEOC and PHRC on April 29, 2018. (Def.'s SUMF ¶ 11; Pl.'s SDF in Opp. ¶ 11.) The EEOC issued a Right to Sue Letter on March 7, 2019 and a supplementary letter with respect to her constructive discharge allegations on May 30, 2019. (Compl. ¶ 9.) This lawsuit was filed within 90 days of the Right to Sue Letters and is therefore timely. (*Id.*)

## II.    **STANDARD OF REVIEW**

Summary judgment is appropriate where admissible evidence fails to demonstrate a genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011). When the movant does not bear the burden of persuasion at trial, it may meet its burden on summary judgment by showing that the non-moving party's evidence is insufficient to carry its burden of persuasion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Thereafter, the non-moving party may demonstrate a genuine issue of material fact if it provides evidence sufficient to allow a reasonable finder of fact to find in its favor at trial. *Anderson*, 477 U.S. at 248. "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192 (3d Cir. 2015) (quoting *Anderson*, 477 U.S. at 252).

In reviewing the record, "a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994). The court may not, however, make credibility determinations or weigh the evidence in considering motions for summary judgment. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

## III.    DISCUSSION

Russo sued the Bank for racial discrimination, retaliation, hostile work environment, and intentional infliction of emotional distress. The Bank seeks summary judgment on all counts. Because Russo failed to proffer sufficient evidence on which a jury could reasonably find for her on any of her claims, the Court grants the Bank's motion in full.

### A.    Racial Discrimination

Russo's racial discrimination claims are subject to the *McDonnell Douglas* burden-shifting framework.[2] "To establish a *prima facie* case, a plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for the position at issue; (3) she suffered a materially adverse employment action; and (4) the circumstances of the adverse employment action support an inference of discrimination." *Heredia-Caines v. Lehigh Valley Hosp., Inc.*, 580 F. Supp. 3d 114, 125 (E.D. Pa. 2022) (citing *Whitmore v. Nat'l R.R. Passenger Corp.*, 510 F. Supp. 3d 295, 304 (E.D. Pa. 2020)) (italicization added). If a plaintiff establishes a *prima facie* case, the employer must offer legitimate, non-discriminatory reasons for the adverse employment action. *See Fuentes*

---

[2]    Russo asserts racial discrimination claims under 42 U.S.C. § 1981, Title VII, and the Pennsylvania Human Relations Act (PHRA). The same burden-shifting framework applies to claims brought under each statute. *See Blakney v. City of Phila.*, 559 F. App'x 183, 187 (3d Cir. 2014); *Tomaszewski v. City of Phila.*, 460 F. Supp. 3d 577, 593 (E.D. Pa. 2020).

*v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). "The employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Id.* (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)).

If the employer provides non-discriminatory reasons for its actions, the plaintiff must then prove that the employer's "explanation is merely a pretext for the discrimination." *Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 842 (3d Cir. 2016). The plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* (quoting *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006)). In doing so, the "plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence.'" *Fuentes*, 32 F.3d at 765 (quoting *Ezold v. Wo,f, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 531 (3d Cir. 1992)).

The parties do not dispute that Russo is a member of a protected class and the Court will assume she was qualified for the position she held. Russo asserts two distinct adverse employment actions that could serve as the basis of her discrimination claim: suspension with pay and constructive discharge. The Court assesses each of these in turn.

### i. Suspension with Pay

The Bank argues that it is entitled to summary judgment because Russo did not suffer a materially adverse employment action. (Def.'s Mem. of Law in Support of its Mot. for Summ. J. [Def.'s Mem.] at 9-10.) Specifically, although Russo was placed on paid administrative leave in

connection with the Bank's investigation into the unlocked combination box, paid administrative leave is not a materially adverse employment action. (*Id.*) The Court agrees.

An adverse employment action is "an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 326 (3d Cir. 2015) (quoting *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004)). In *Jones*, the Third Circuit joined the "chorus" of other courts of appeals that have concluded that "[a] paid suspension pending an investigation of an employee's alleged wrongdoing does not fall under any of the forms of adverse action mentioned by Title VII's substantive provision." *Id.* As the Third Circuit explained, this is because "[a] paid suspension is neither a refusal to hire nor a termination, and by design it does not change compensation. Nor does it effect a 'serious and tangible' alteration of the 'terms, conditions, or privileges of employment,' . . . because 'the terms and conditions of employment ordinarily include the possibility that an employee will be subject to an employer's disciplinary policies in appropriate circumstances.'" *Id.* (quoting *Storey*, 390 F.3d at 764 and *Joseph v. Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006)). It therefore held "that a suspension with pay, 'without more,' is not an adverse employment action under the substantive provision of Title VII." *Id.* (quoting *Joseph*, 465 F.3d at 91).

Where a plaintiff can show something "more," however, suspension with pay may constitute an adverse employment action. *Id.* For example, a plaintiff who "was required to undergo a medical evaluation" and "was required to sign a PIP without a union representative" established that her paid leave was an adverse employment action. *Thourot v. Monroe Career & Tech. Inst.*, No. 14-1779, 2016 WL 6082238, at *5 (M.D. Pa. Oct. 17, 2016). Similarly, an employer's failure to provide a justification for placing an employee on paid leave may render paid

11

leave an adverse employment action. *See Vay v. Huston*, No. 14-769, 2016 WL 7324596, at *13 (W.D. Pa. Dec. 16, 2016).

In this case, however, Russo has not shown that her suspension with pay contained something "more" such that it could be an adverse employment action. *Jones*, 796 F.3d at 326. The record establishes that Russo was suspended in connection with the Bank's investigation into possible improper conduct related to security protocols and she was fully compensated during her suspension. (Def.'s SUMF ¶¶ 75, 82, 87.) *Jones* therefore controls and Russo cannot maintain a discrimination claim based on her paid suspension.

### ii. Constructive Discharge

Alternatively, Russo asserts her purported constructive discharge constitutes an adverse employment action. "Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes." *Pa. State Police v. Suders*, 542 U.S. 129, 141 (2004). To establish that she was constructively discharged, Russo must show that the Bank "knowingly permitted discriminatory employment conditions 'so intolerable' that a 'reasonable person subject to them would have to resign.'" *Heredia-Caines*, 580 F. Supp. 3d at 128 (quoting *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1084 (3d Cir. 1996)). This is an objective inquiry "that focuses not on how the plaintiff experienced her work environment but on how a reasonable person would have." *Id.*; *see also Hibbard v. Penn-Trafford Sch. Dist.*, No. 13-622, 2014 WL 640253, at *8 (W.D. Pa. Feb. 19, 2014) (quoting *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1079 (3d Cir. 1992)) (plaintiff must show that employer's conduct made "working conditions so unpleasant or intolerable that a reasonable person in the employee's shoes would resign"). Accordingly, "[a]n employee's reliance on the subjective impact of the employer's actions will not suffice, as 'the law

12

does not permit an employee's subjective perceptions to govern a claim of constructive discharge.'" *Hibbard*, 2014 WL 640253, at *8 (quoting *Gray*, 957 F.2d at 1082). To determine if an employee was forced to resign, courts may consider various factors, "including whether (1) she was threatened with discharge; (2) she was encouraged to resign; (3) she was demoted or suffered a reduction in pay or benefits; (4) she was involuntarily transferred to a less desirable position; (5) her job responsibilities were altered; and (6) she began receiving unsatisfactory job evaluations." *Seeney v. Elwyn, Inc.*, 409 F. App'x 570, 573 (3d Cir. 2011).

Russo has not provided any evidence suggesting that any of these factors contributed to her constructive discharge. *See Brooks v. CBS Radio, Inc.*, 342 F. App'x 771, 777 (3d Cir. 2009); *Heredia-Caines*, 580 F. Supp. 3d at 128. Although "[t]he absence of the factors . . . is not necessarily dispositive," Russo fails to point to other facts and circumstances that establish that she was constructively discharged. *Duffy v. Paper Magic Grp., Inc.*, 265 F.3d 163, 168 (3d Cir. 2001); *see also Seeney*, 409 F. App'x at 574. The record clearly shows that Russo resigned because she was upset that the Bank provided a customer thirty days to end her relationship with the Bank rather than terminating that relationship immediately. (Def.'s SUMF ¶¶ 146-47; Pl.'s SDF in Opp. ¶ 147; Def.'s Ex. 212.) Even if Russo is correct that it is technically possible to close a customer's account at the Bank immediately (*see* Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ. J. [Pl.'s Opp.] at 9; Pl.'s SDF in Opp. ¶ 140), as explained further below, the Bank was merely applying its standard de-marketing policy to this customer. Russo may have "subjectively perceived" the Bank handled this incident in an "objectionable" manner. *Hibbard*, 2014 WL 640253, at *8. But a reasonable employee would not have found the resulting working conditions—the possibility that an offensive customer might return to the branch—so "unendurable" that they had no choice but to resign. *Suders*, 542 U.S. at 141; *see also Hibbard*,

13

2014 WL 640253, at *9. Stated differently, Russo's job may have been "more stressful" because of the Bank's conduct, but it did not become "objectively intolerable" or "unbearable."[3] *Duffy*, 265 F.3d at 169; *see also Heredia-Caines*, 580 F. Supp. 3d at 129 ("[T]he severity of Plaintiff's subjective experience of her work environment cannot make up for her lack of admissible evidence of objectively intolerable work conditions.").

Even assuming Russo was constructively discharged, Russo still fails to establish a *prima facie* case because the circumstances of her constructive discharge do not support an inference of discrimination. *See Jones*, 796 F.3d at 327 (affirming summary judgment in favor of defendant where plaintiff failed to show "some causal nexus" between her protected status and defendant's adverse treatment) (quoting *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 798 (3d Cir. 2003)). Russo resigned because she was upset that a hostile customer was given thirty days to leave the Bank. (Def.'s SUMF ¶¶ 146-47; Pl.'s SDF in Opp. ¶ 147; Def.'s Ex. 212.) Russo views the Bank's decision as one meant to harass her because the customer could return to the branch and offend her again. (Pl.'s SDF in Opp. ¶ 147; Def.'s Ex. 212.). In her view, the Bank could have and should have immediately terminated its relationship with the customer. (Pl.'s Opp. at 9.) Russo emphasizes that the letter sent to the customer states that the Bank gave the customer thirty days

---

[3]    Russo also fails to establish that she was constructively discharged because she has not shown that she was subject to a hostile working environment, as explained in Section III.C. *See Heredia-Caines*, 580 F. Supp. 3d at 128 ("Discrimination must be more severe or pervasive to establish a claim for constructive discharge than it need be to establish a claim for hostile work environment.") (citing *Spencer v. Wal-Mart Stores, Inc.*, 469 F.3d 311, 317 n.4 (3d Cir. 2006)). Moreover, by the time Russo resigned, Trainer had not supervised or worked with Russo for nearly a year. Other than construing Yovanov's suggestion that Russo apply for a promotion as discriminatory, Russo does not complain of any discriminatory conduct during the several months leading up to her purported constructive discharge, which significantly undermines her claim. *See id.* at *8-9 (rejecting constructive discharge claim where allegedly discriminatory supervisor transferred departments six months prior to plaintiff's resignation and plaintiff did not produce evidence supporting allegations of discrimination or retaliation occurring in the several months prior to resigning).

14

to close her accounts "[a]s a courtesy." (*Id.* (quoting Def.'s Ex. 280).) She argues this shows that the Bank could have closed the customer's accounts immediately, without this courtesy, but chose not to do so. (*Id.*; Pl.'s SDF in Opp. ¶ 140.) But she fails to show how affording the customer time to close her accounts supports an inference of racial discrimination. *See Dykes v. Marco Grp., Inc.*, 222 F. Supp. 3d 418, 428-29 (E.D. Pa. 2016).

Furthermore, the Bank has provided a legitimate reason for its conduct: it was applying its standard de-marketing policy. (Def.'s Mem. at 12.) Although the de-marketing letter sent to the customer states that the Bank was providing her with thirty days to close her accounts "[a]s a courtesy," this is form language found in a template used in other instances of de-marketing that reflects the Bank's standard policy. (*Id.*; *see also* Def.'s Exs. 280-81; Sanchez Dep. at 81:1-7 (explaining that "the standard procedure for demarketing a customer is to give the customer 30 days to transfer their accounts").) Contrary to Russo's argument, the natural reading of this language in no way reflects a conscious, affirmative decision by the Bank to be particularly generous towards this customer and give her more time to transition to a new financial institution than any other customer would have had. (*See* Pl.'s Opp. at 9.) In fact, rather than dragging its heels, the Bank acted swiftly once Russo raised concerns regarding this customer. The Bank immediately investigated this incident and decided to end its relationship with this customer within 24 hours. (Def.'s SUMF ¶¶ 131-41; Def.'s Exs. 209-11.) Thus, the Bank has proffered a non-discriminatory explanation for its conduct. *See Bazargani v. Haverford State Hosp.*, 90 F. Supp. 2d 643, 650 (E.D. Pa. 2000) (finding application of employer's standard policy a "legitimate, non-discriminatory reason" for challenged conduct); *see also In re Tribune Media Co.*, No. 16-226, 2017 WL 2622743, at *9-10 (D. Del. June 16, 2017) (same).

15

Russo fails to rebut this explanation as pretextual and therefore cannot maintain a claim that her alleged constructive discharge was the product of discrimination. *See West v. Hudson Cnty. Corr. Ctr.*, 231 F. App'x 136, 139 (3d Cir. 2007) (affirming summary judgment for defendant on race discrimination claims where plaintiff failed to rebut defendant's claim that its conduct was the result of application of standard policies).

The Bank's motion for summary judgment with respect to Russo's discrimination claims is therefore granted.

## B. <u>Retaliation</u>

Russo's retaliation claims under Title VII and the PHRA are also subject to the *McDonnell Douglas* framework. *See Anderson v. Boeing Co.*, 694 F. App'x 84, 85-86 (3d Cir. 2017). To establish a *prima facie* case of retaliation, a plaintiff must show that: "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." *Moore v. City of Phila.*, 461 F.3d 331, 340-41 (3d Cir. 2006) (quoting *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)). In the retaliation context, an adverse employment action must be "materially adverse," meaning "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Daniels*, 776 F.3d at 195 (quoting *Burlington N. & Santa Fe. Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). To assess whether protected activity and retaliatory conduct are causally connected, a court may analyze "the temporal proximity between the two if 'unusually suggestive,'" or in the alternative, "the circumstances as a whole, including any intervening antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and any other evidence suggesting that the employer had a

retaliatory animus when taking the adverse action." *Id.* at 196 (quoting *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007)).

Once a plaintiff has established a *prima facie* case, the employer must provide "'a legitimate, non-retaliatory reason' for its conduct." *Moore*, 461 F.3d at 342 (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500-01 (3d Cir. 1997)). The plaintiff may rebut this explanation by showing the employer's reasons for its conduct are pretextual. *Id.* "[T]he plaintiff must produce 'sufficient evidence to raise a genuine issue of fact as to whether the employer's proffered reasons were not its true reasons for the challenged employment action.'" *Krouse*, 126 F.3d at 504 (quoting *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1067 (3d Cir. 1996)). To cast enough doubt onto the employer's proffered reasons, a plaintiff must show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.'" *Whitmore*, 510 F. Supp. 3d at 309 (quoting *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 306 (3d Cir. 2007)).

Russo asserts several purported retaliatory actions the Bank took after she complained about Trainer to Fryer and Biernacki and she filed her formal complaints with the EEOC and PHRC in April 2018.[4] Russo argues that the unlocked "vault/key box accusation . . . was a set up in retaliation for [her] racial complaints." (Pl.'s Opp. at 7; *see also id.* at 6, 24; Pl.'s SDF ¶ 26.) She also claims that the Bank retaliated against her when she was allegedly pressured to stop the newspaper story regarding the Bank from going forward and when the Bank did "not protect[]

---

[4]     "For purposes of the first prong of a *prima facie* case of retaliation, protected 'opposition' activity includes not only an employee's filing of formal charges of discrimination against an employer but also 'informal protests of discriminatory employment practices, including making complaints to management.'" *Daniels*, 776 F.3d at 193 (quoting *Curay-Cramer v. Ursuline Acad. cf Wilmington, Del., Inc.*, 450 F.3d 130, 135 (3d Cir. 2006)).

[her] and purposefully g[ave] the offending customer the courtesy of thirty days instead of an immediate demarketing." (Pl.'s Opp. at 24.)

With respect to Russo's first argument, the record disputes her contention that the investigation into the unlocked box "was a set up" in response to her protected conduct. (*Id.* at 7.) Brown-Hinton discovered that the combination box was unlocked on April 27, but Russo did not file her EEOC complaint until two days later. (Def.'s SUMF ¶ 55; *see also* Def.'s Ex. 241.) The investigation therefore cannot be considered an adverse employment action for retaliation purposes. *See Daniels*, 776 F.3d at 196 (rejecting retaliation claim based on purported adverse employment action that "preceded [plaintiff's] first protected activity"). Although Russo raised complaints about Trainer prior to this, nothing in the record suggests that Brown-Hinton was aware of those complaints or had any motive to retaliate against Russo for doing so. *See id.* (noting that plaintiff "cannot establish that there was a causal connection without some evidence that the individuals responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted"). Furthermore, during the Bank's investigation into the facts and circumstances surrounding the unlocked box, Wilson implicated herself in potential misconduct by admitting that she and Russo taped the box shut. (Def.'s SUMF ¶ 61; Def.'s Ex. 241.) Finally, the Bank also learned that Russo gave a new employee a set of keys that belonged to a different teller through the investigation. (Def.'s SUMF ¶ 58; Def.'s Ex. 241.) Even assuming Russo's resultant paid suspension could serve as an adverse employment action,[5] the Bank's decision to place Russo on paid leave was supported by a legitimate, non-retaliatory explanation that Russo has failed to rebut.

---

[5]     The Bank again relies on *Jones* and argues that Russo's paid suspension cannot constitute an adverse employment action for purposes of her retaliation claims. (Def.'s Mem. at 15.) However, in *Jones*, the Third Circuit did "not consider" or "decide whether a paid suspension constitutes an adverse action in the retaliation context." *Jones*, 796 F.3d at 325. This Court need not do so, either.

Nor can Russo assert a retaliation claim based on purported threats that "things would be bad" if she did not stop the newspaper article from being published. (Pl.'s Opp. at 24; Pl.'s SDF ¶ 25.). "Words alone, even when harsh, do not constitute an adverse action if they are unaccompanied by follow up discipline or other negative action." *Raffaele v. Potter*, No. 09-3622, 2012 WL 33035, at *9 (E.D. Pa. Jan. 6, 2012) (collecting cases). Russo has not shown that the Bank acted unfavorably toward her in any way after this meeting or that this alleged threat had any impact on her employment. This is therefore not a materially adverse action for purposes of a retaliation claim. *See Hudson v. Cheyney Univ. of Pa.*, No. 14-2552, 2018 WL 6603870, at *7 (E.D. Pa. Dec. 14, 2018) (rejecting "the threat of termination" as "an adverse employment action because no punitive action was taken against plaintiff"); *Nolan v. Swartz Campbell, LLC*, No. 05-1508, 2008 WL 598291, at *20 (W.D. Pa. Feb. 29, 2008) (finding conversation where superior told plaintiff that her "colleagues resented her" and suggested she drop a lawsuit and/or resign insufficient to support retaliation claim where it was not "attached to or . . . connected with" materially adverse action because "merely experiencing some apprehension and subjectively feeling intimidated from such a conversation hardly amounts to the type [of] measures that the courts have found sufficient to support a claim of retaliation"); *Pugni v. Reader's Digest Ass'n, Inc.*, No. 05-8026, 2007 WL 1087183, at *23 (S.D.N.Y. Apr. 9, 2007) (finding "alleged 'threat' that plaintiff's days" were "numbered" was not "a materially adverse action" for retaliation claim).

Similarly, the Bank's decision to de-market a customer and give her thirty days to close her accounts is not an adverse employment action for purposes of establishing a *prima facie* case. However, even if this could serve as the basis of a retaliation claim, Russo is unable to establish a causal connection between the Bank's decision and her protected activity given that they occurred over a year apart. *See Rhoden v. Children's Hosp. of Pittsburgh of UPMC Health Sys.*, 749 F.

19

App'x 86, 89-90 (3d Cir. 2018) (affirming summary judgment where plaintiff "cannot show a causal link between her filing of an EEOC complaint in October 2012 and" the employer's alleged adverse employment action in October 2013); *see also Daniels*, 776 F.3d at 198 (ten months insufficient to establish causal connection). And Russo fails to "present[] any other evidence that suggests" the Bank gave the customer 30 days to close her accounts in response to Russo's protected conduct. *See Rhoden*, 749 F. App'x at 90; *see also Daniels*, 776 F.3d at 198. Finally, as noted above, the Bank applied a standard policy when it de-marketed this customer, which Russo failed to show was pretextual.[6] *See supra* Section III.A.ii.

The Bank is therefore entitled to summary judgment on Russo's retaliation claims.

## C. Hostile Work Environment

"To establish a hostile work environment claim," Russo must show: "(1) that she suffered intentional discrimination because of her race . . . ; (2) that the discrimination was severe or pervasive; (3) that the discrimination detrimentally affected the plaintiff; (4) that the discrimination would detrimentally affect a reasonable person in like circumstances[;] and (5) the existence of *respondeat superior* liability."[7] *Davis*, 2022 WL 970842, at *5 (citing *Minarsky v. Susquehanna Cnty.*, 895 F.3d 303, 310 (3d Cir. 2018)). A hostile work environment exists when a "workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or

---

[6]     Although not mentioned in her brief, Russo also implicitly argues that any of the following could be retaliatory actions: Trainer assigning credit for a new account to another teller (Def.'s SUMF ¶ 42; Pl.'s SDF in Opp. ¶ 42); Trainer asking her to drive to another branch to pick up an employee and transport coins back to her branch (Def.'s SUMF ¶ 50; Pl.'s SDF in Opp. ¶ 50); and Yovanov suggesting she apply for a promotion (Def.'s SUMF ¶ 116; Pl.'s SDF in Opp. ¶ 116). These do not rise to the level of materially adverse retaliatory actions.

[7]     Russo's hostile work environment claims under Title VII and the PHRA "are subject to the same legal standard, so the Court will analyze them together." *Davis v. Elwyn, Inc.*, No. 20-5798, 2022 WL 970842, at *5 (E.D. Pa. Mar. 31, 2022) (citing *Atkinson v. Lafayette Coll.*, 460 F.3d 447, 464 n.6 (3d Cir. 2006)).

pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (quoting *Harris v. Forkl,ft Sys., Inc.*, 510 U.S. 17, 21 (1993)). To determine whether such an environment exists, "a court must consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 168 (3d Cir. 2013) (quoting *Harris*, 510 U.S. at 23).

### i. Applicable Limitations Periods under Title VII and the PHRA

Prior to asserting claims under Title VII and the PHRA in federal court, plaintiffs in Pennsylvania must exhaust administrative remedies with both the EEOC and the PHRC. *See Mandel*, 706 F.3d at 163. Title VII provides that charges of discrimination "shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). However, if the charges are also filed "with a State or local agency with authority to grant or seek relief from such practice," such as the PHRA, then the limitations period is enlarged to "within three hundred days after the alleged unlawful employment practice occurred." *Id.*; *see also Drake v. Stean,fitters Local Union No. 420*, No. 01-6968, 2005 WL 196444, at *6 (E.D. Pa. Jan. 27, 2005). Although the PHRA, like Title VII, requires filing a charge of discrimination within 180 days, it does not contain an analogous enlargement provision. *See Brown v. Tait Towers M,fg., LLC*, No. 21-4573, 2022 WL 206177, at *4 (E.D. Pa. Jan. 21, 2022). In effect, this means that the limitations period for a plaintiff's Title VII claims can be greater than the limitations period for her PHRA claims. *See Mandel*, 706 F.3d at 164-65 (agreeing with district

court's application of different statutes of limitations for Title VII and PHRA claims); *Brown*, 2022 WL 206177, at *3-4. Such is the case here.

Russo "filed a charge of discrimination with the EEOC and PHRC" on April 29, 2018. (Def.'s SUMF ¶ 11; Pl.'s SDF in Opp. ¶ 11.) Accordingly, conduct is actionable in this lawsuit only if it occurred after July 3, 2017 (under Title VII) or after October 31, 2017 (under the PHRA). *See Brown*, 2022 WL 206177, at *4.

### ii. **The Continuing Violation Doctrine**

The continuing violation doctrine provides an exception to these statutes of limitations by allowing a plaintiff to aggregate "discriminatory acts that are not individually actionable . . . to make out a hostile work environment claim; such acts 'can occur at any time so long as they are linked in a pattern of actions which continues into the applicable limitations period.'" *Mandel*, 706 F.3d at 165 (quoting *O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir. 2006)). To invoke the continuing violation doctrine, "the plaintiff must show that all acts which constitute the claim are part of the same unlawful employment practice and that at least one act falls within the applicable limitations period." *Id.* at 165-66 (citing *Morgan*, 536 U.S. at 122). Therefore, "the employee need only file a charge within 180 or 300 days of any act that is part of the hostile work environment" for a claim to be timely. *Morgan*, 536 U.S. at 118.

In contrast, "discrete acts, which are individually actionable," such as "termination, failure to promote, denial of transfer, refusal to hire, wrongful suspension, wrongful discipline, denial of training, [and] wrongful accusation," cannot be aggregated. *O'Connor*, 440 F.3d at 127. For these "discrete acts," "the limitations period runs from the act." *Id.*

22

### iii. **Russo's Hostile Work Environment Claim**

Given the statutes of limitations that apply to Russo's claims, the only conduct that could serve as the basis for establishing she suffered from a hostile work environment is Trainer's statement that "she was tired of Black people complaining and acting like victims" in February 2018.[8] (Def.'s SUMF ¶ 30; Pl.'s SDF in Opp. ¶ 30.) But "Title VII is not violated by the '[m]ere utterance of an . . . epithet which engenders offensive feelings in an employee' or by mere 'discourtesy or rudeness,' unless so severe or pervasive as to constitute an objective change in the conditions of employment." *Lawrence v. F.C. Kerbeck & Sons*, 134 F. App'x 570, 572 (3d Cir. 2005) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)). Nor does "a lack of racial sensitivity . . . alone, amount to actionable harassment." *Faragher*, 524 U.S. at 787. Trainer's statement is a "mere offensive utterance" that is insufficient to establish that the Bank was "permeated" with discrimination or that Russo faced "severe or pervasive" discrimination necessary for her hostile work environment claim. *Lawrence*, 134 F. App'x at 572; *see also Dykes*, 222 F. Supp. 3d at 430-31 (quoting *Greer v. Mondelez Global, Inc.*, 590 F. App'x 170, 174 (3d Cir. 2014)) (finding two "unwelcome and personally offensive" comments insufficient to constitute "'severe and pervasive conduct necessary to constitute a hostile work environment'"); *Huggins v. Coatesville Area Sch. Dist.*, Nos. 07-4917, 09-1309, 2010 WL 4273317, at *6 (E.D. Pa. Oct. 29, 2010) (finding two inappropriate racial comments insufficient "to have altered the terms and conditions" of employment for purposes of a hostile work environment claim).

---

[8]    For purposes of this motion, the Court assumes that this occurred. As the Bank explains, however, the only reference to this statement in the record appears in Russo's deposition testimony and this incident does not appear in the letter Russo's lawyer sent the Bank only a few months after this purportedly occurred. (*See* Def.'s Mem. at 18-19; *see also* Def.'s SUMF ¶¶ 92-93; Pl.'s SDF in Opp. ¶¶ 92-93; Russo Ex. 2.)

Even if the Court were to use this statement as the basis for a continuing violation theory and consider the time-barred conduct Russo identified, Russo's claim still fails to survive the Bank's motion for summary judgment. *See Reid v. Sleepy's, LLC*, No. 14-2006, 2016 WL 3345521, at *11-13 (M.D. Pa. June 16, 2016) (granting summary judgment on hostile work environment claim relying on continuing violation theory because, even considered collectively, "the alleged harassment was [not] severe or pervasive enough to constitute a hostile work environment"). Russo identified several inappropriate statements related to race that Trainer made over the course of roughly two years as well as other conduct she found objectionable..[9] Although undoubtedly offensive, problematic, and misplaced, even taken as a whole, these acts do not rise to the level of being sufficiently severe or pervasive to establish a *prima facie* case of a hostile work environment. *See Exantus v. Harbor Bar & Brasserie Rest.*, 386 F. App'x 352, 354 (3d Cir. 2010) (affirming summary judgment for defendant on hostile work environment claim because use of "unpalatable and inappropriate" racial epithets was not "pervasive and severe"); *Sherrod v. Phila. Gas Works*, 57 F. App'x 68, 75-77 (3d Cir. 2003) (finding derogatory comment referring to "culture" of African American employees, manager's statement that he was "going to sit at [African American employees'] desks with a whip," placing minority employees' desks "directly in front of their white supervisor's office windows," excluding plaintiff from a meeting, turning away from plaintiff to "snub" her, and screaming at plaintiff insufficiently "severe and pervasive" to establish hostile work environment). Trainer's comments were "not particularly frequent" and were "not physically threatening or humiliating." *Brooks*, 342 F. App'x at 777; *see also Sherrod*, 57 F. App'x at 77. Russo no doubt felt "uncomfortable" as a result. *Laye v. Potter*, No. 04-0046,

---

[9]     Russo's paid administrative leave and resignation are "discrete acts" that cannot be aggregated with other conduct for purposes of this analysis. *See O'Connor*, 440 F.3d at 127.

2006 WL 1617777, at *6 (W.D. Pa. June 2, 2006). But these statements were not severe or pervasive enough to alter the terms and conditions of Russo's employment. *See Woodard v. PHB Die Casting*, 255 F. App'x 608, 609-10 (3d Cir. 2007) (affirming summary judgment on hostile work environment claim because African American plaintiff being "asked questions using the phrase 'you people'" and whether "he intended to complete a drug deal during a bathroom break" "are the type of offhand comments that are insufficient to support a hostile work environment claim"); *Blake v. Penn State Univ. Greater Allegheny Campus*, No. 09-1182, 2011 WL 841374, at *11 (W.D. Pa. Mar. 8, 2011) (granting summary judgment where use of "racially derogatory terms" did "not rise to the level of severe and pervasive required to support a hostile work environment claim"); *Eric v. Donsco Inc.*, No. 09-1052, 2010 WL 5018574, at *6 (M.D. Pa. Oct. 12, 2010) (finding several incidents of "name-calling" with "racial animus" insufficient "to establish that Plaintiff was subjected to regular and pervasive harassment based upon race"), *report and recommendation adopted*, 2010 WL 5014292 (M.D. Pa. Dec. 3, 2010); *Rose v. Woolworth Corp.*, 137 F. Supp. 2d 604, 607, 611 (E.D. Pa. 2001) (granting summary judgment on hostile work environment claim where supervisor "made a number of racist remarks, including referring to the black community as a baby factory, stating that blacks are incapable of thinking analytically, and warning Plaintiff not to talk to white women" because comments were not "extreme" enough "to constitute a 'change in terms and conditions of employment'") (quoting *Faragher*, 524 U.S. at 788).

Finally, other conduct Russo complains of, such as having trouble scheduling a PTO day, being told to drive to another branch, not receiving origination credit for a new account, and being told not to leave the premises during her lunch break, are the sorts of frustrating tensions between an employee and her supervisor that are inherent in the workplace. *See Charles v. Mott's LLP*, No.

17-2879, 2018 WL 2002794, at *4 (D.N.J. Apr. 30, 2018). These were "neither physically threatening nor humiliating and would not reasonably interfere with work performance" and cannot be used to establish a hostile work environment claim. *Eric*, 2010 WL 5018574, at *6.

The Bank's motion is therefore granted.

### D. Intentional Infliction of Emotional Distress

Russo also asserts a claim of intentional infliction of emotional distress. The Bank argues that the Pennsylvania Workman Compensation Act preempts this claim. (Def.'s Mem. at 22.) Russo "does not contest Defendant's Motion for Summary Judgment as to" this claim. (Pl.'s Opp. at 12 n.5.) Accordingly, the Court will grant summary judgment in favor of the Bank on this claim.

## IV.    CONCLUSION

For the reasons discussed above, the Court grants the Bank's motion for summary judgment as to all claims. To be clear, the Court does not discredit Russo's feelings of offense, anger, or frustration, as the conduct at issue in this case is entirely unprofessional. But employment law is not a civility code and Russo has failed to put forth sufficient facts to defeat the Bank's motion for summary judgment. Despite this, the Court's decision should not be interpreted as condoning the Bank's or its employees' actions.

An Order consistent with this Memorandum will be docketed separately.

Appx26

### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **WANDREA RUSSO,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **THE BRYN MAWR TRUST COMPANY,** | : | **No. 19-2408** |
| **Defendant.** | : | |

### <u>ORDER</u>

**AND NOW**, this **27th** day of **October 2022**, after consideration of Defendant The Bryn Mawr Trust Company's Motion for Summary Judgment (ECF 30), Plaintiff Wandrea Russo's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment (ECF 31), and Defendant's Reply in Support of its Motion for Summary Judgment (ECF 32), it is hereby **ORDERED** that:

1. Defendant's Motion (ECF 30) is **GRANTED**.

2. The Clerk of Court is directed to close this case.

**BY THE COURT:**

**Berle M. Schiller, J.**

Appx27

## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **WANDREA RUSSO**<br><br>**Plaintiff,**<br><br>vs.<br><br>**THE BRYN MAWR TRUST COMPANY**<br>**Defendants** | **CIVIL ACTION- 2:19-cv-02408**<br><br><br>**NOTICE OF APPEAL** |

**NOTICE OF APPEAL**

COMES NOW, PLAINTIFF  WANDREA RUSSO, by her undersigned counsel, who appeals  to the U.S. Court of Appeals for the Third Circuit  from this Court's  Order of October 27, 2022 (#35)  granting Defendant's motion for summary judgment and entering judgment against Plaintiff .

Respectfully submitted,

Mark D. Schwartz, Esquire

*/s/: Mark D. Schwartz*

_____
MARK D. SCHWARTZ, Esquire
PA I.D. #30527

300 Sandcastle Drive
Bryn Mawr, PA 19010
Telephone:  610 525-5534
Facsimile:   610 525-5534
Email: markschwartz6814@gmail.com

Dated: November 25, 2022          Counsel for Plaintiff Wandrea Russo

Appx28

2

Appx29