NO. 22-3235

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

WANDREA RUSSO,

Appellant,

v.

BRYN MAWR TRUST CO.,

Appellee.

ON APPEAL FROM THE UNITED STATES TRIAL COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
(E.D. Pa. Case No. 2:19-cv-02408)
(before the Honorable Berle M. Schiller)

BRIEF OF APPELLEE
THE BRYN MAWR TRUST COMPANY

**COZEN O'CONNOR**

Aaron Krauss (62419)
Cara Kaplan (329901)
1650 Market Street, Suite 2800
Philadelphia, PA 19103
(215) 665-4181
akrauss@cozen.com

Attorneys for Appellee,
The Bryn Mawr Trust
Company

### CORPORATE DISCLOSURE STATEMENT AND STATEMENT OF FINANCIAL INTEREST

Pursuant to Federal Rule of Appellate Procedure 26.1 and Third Circuit Local Appellate Rule 26.1, Appellee Bryn Mawr Trust Company[1] ("BMT") makes the following disclosures:

(1)   BMT is a non-governmental corporate party;

(2)   BMT is a wholly owned subsidiary of the Bryn Mawr Trust Corporation, a banking holder company (BMBC).  In 2021, WSFS Financial Corporation, acquired BMBC, including BMT.  For ease of reference, the appellee will continue to be referred to as BMT;

(3)   BlackRock Institutional Trust Company, N.A. and The Vanguard Group, Inc. both own more than 10% of WSFS Financial Corporation Stock; and

(4)   No publicly-held corporate entities which are not parties to the proceeding before this Court have a financial interest in the outcome of the proceeding.

---

[1] The caption incorrectly states that Bryn Mawr Bank Corporation is "doing business as" Bryn Mawr Trust Company.  Rather, Bryn Mawr Bank Corporation is a bank holding company and the parent of The Bryn Mawr Trust Company (BMT). BMT is the company that employed Wandrea Russo and is therefore the real party in interest.  In 2021, WSFS Financial Corporation acquired Bryn Mawr Bank Corporation, including BMT.  As part of that process, Bryn Mawr Trust Company was merged into Wilmington Savings Fund Society.  For clarity and ease of reference, the real party in interest will continue to be referred to as BMT.

# **TABLE OF CONTENTS**

**Page**

I.    ISSUES PRESENTED FOR REVIEW ...........................................................1

II.   STATEMENT OF THE CASE ...................................................................1

III.  SUMMARY OF ARGUMENT ...................................................................9

IV.  STATEMENT OF THE STANDARD AND SCOPE OF REVIEW............11

V.   ARGUMENT ...........................................................................................12

  A.  This Court Should Reject Russo's Invitation To Overrule Existing Law.....12

    1.   This Court Should Reject Russo's Invitation To Be The First Court To Ever Hold That Title VII Is A Civility Code .....................................................13

    2.   This Court Should Reject Russo's Invitation To Be The First Court To Ever Hold That The Standard For Finding Constructive Discharge Is A Subjective Standard, Rather Than An Objective Standard...............................14

  B.  Under The Governing Law, The Trial Court Correctly Granted BMT's Motion for Summary Judgment .........................................................................17

    1.   The Trial Court Correctly Found That Russo Did Not Suffer From An Adverse Employment Action...........................................................................18

      a.   Russo Voluntarily Resigned And Was Not Subject To A Constructive Discharge ........................................................................................19

      b.   A Paid Suspension Does Not Constitute An Adverse Employment Action...........................................................................................23

    2.   Even If This Court Were To Find That Russo Suffered An Adverse Employment Action, There Was No Link Between Her Protected Activity And The Subsequent Action To Establish A Claim For Retaliation .......................25

    3.   Even If This Court Were To Find That Russo Suffered An Adverse Employment Action, There Was A Neutral Explanation For That Action ......27

    4.   Russo Failed To Proffer Admissible Evidence Sufficient For A Jury To Find She Was Subject To A Hostile Work Environment .................................30

a.   The Trial Court Correctly Held That The Continuing Violation Doctrine Does Not Apply To Russo's Claims ............................................................31

b.   The Only Timely Incidents Offered By Russo Are Not Sufficient To Establish A Hostile Work Environment And Have A Neutral, Non-Pretextual, Explanation..................................................................................34

C.   This Is Not The Appropriate Case For This Court To Accept The EEOC's Invitation To Overrule Settled Law.....................................................................39

1.   This Court Should Not Reverse The Trial Court's Grant Of Summary Judgment By Overruling Jones .........................................................................40

a.   *Stare Decisis*, And This Court's Internal Operating Procedures, Preclude This Panel From Overruling Jones ...............................................................41

b.   Russo Has Admitted That Her Suspension Was Based On BMT's Neutrally Applied Policies................................................................................42

2.   This Court Should Not Reverse The Trial Court's Grant Of Summary Judgment Based On An Unfulfilled Threat ....................................................43

a.   The EEOC Is Making An Argument That Russo Did Not Make...........43

b.   The Alleged Unfulfilled Threat Does Not Relate To Protected Activity...................................................................................................................46

c.   Russo Failed To Proffer Admissible Evidence That The Unfulfilled Threat Was Material ...................................................................................48

VI.   CONCLUSION...........................................................................................49

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Bazargani v. Haverford State Hasp.,
  90 F. Supp. 2d 643, 650 (E.D. Pa. 2000)............................................................28

Billings v. Town of Grafton,
  515 F.3d 39, 54-55 (1st Cir. 2008) ....................................................................46

Breaux v. City of Garland,
  205 F.3d 150, 158 (5th Cir. 2000) ......................................................................42

Bristow v. Daily Press, Inc.,
  770 F.2d 1251 (4th Cir. 1985) ............................................................................15

Brooks v. CBS Radio, Inc.,
  342 F. App'x 771 (3d Cir. 2009) ........................................................................34

Burlington N. & Santa Fe Ry. Co. v. White,
  548 U.S. 53 (2006).............................................................................9, 13, 46, 48

Calero v. Cardone Indus., Inc.,
  2012 WL 2547356 (E.D. Pa. June 29, 2012)................................................28, 29

Capilli v. Whitesell Const. Co.,
  271 F. App'x 261 (3d Cir. 2008) ........................................................................29

Charles v. Mott's LLP,
  2018 WL 2002794 (D.N.J. Apr. 30, 2018)............................................33, 35, 39

Clark Cnty. Sch. Dist. v. Breeden,
  532 U.S. 268 (2001).............................................................................................26

Clarkson v. SEPTA,
  700 F. App'x 111 (3d Cir. 2017) ........................................................................13

Colwell v. Rite Aid Corp.,
  602 F.3d 495 (3d Cir. 2010) .........................................................................passim

Cox v. Onondaga Cnty. Sheriff's Dep't,
  760 F.3d 139 (2d Cir. 2014) ...............................................................................47

Davis v. City of Newark,
    417 F. App'x 201 (3d Cir. 2011) ........................................................13

Davis v. Legal Servs. Alabama, Inc.,
    19 F.4th 1261 (11th Cir. 2021) ......................................................9, 24

Davis v. Metro Parks & Recreation Dep't,
    854 F. App'x 707 (6th Cir. 2021) ....................................................14

DiBiase v. SmithKline Beecham Corp.,
    48 F.3d 719 (3d Cir. 1995) ..........................................................45, 46

E.E.O.C. v. Allstate Ins. Co.,
    778 F.3d 444 (3d Cir. 2015) ............................................................47

Escanio v. United Parcel Service,
    538 F. App'x 195 (3d Cir. 2013) ......................................................25

Exantus v. Harbor Bar & Brasserie Rest.,
    386 F. App'x 352 (3d Cir. 2010) ......................................................35

F.D.I.C. v. Deglau,
    207 F.3d 153 (3d Cir. 2000) ............................................................46

Fanelli v. Eye Consultants of Pennsylvania, PC,
    2022 WL 79629 (E.D. Pa. Jan. 6, 2022) ..........................................19

Faragher v. City of Boca Raton,
    524 U.S. 775 (1998) ...................................................................13, 36

Fenter v. Mondelez Global LLC,
    574 F. App'x 213 (3d Cir. 2014) ......................................................36

Fichter v. AMG Resources Corp.,
    528 F. App'x 225 (3d Cir. 2013) ................................................36, 37

Fogleman v. Mercy Hosp., Inc.,
    283 F.3d 561 (3d Cir. 2002) ............................................................47

Garcetti v. Ceballos,
    547 U.S. 410 (2006) ........................................................................48

*Gartman v. Gencorp Inc.,*
 120 F.3d 127 (8th Cir. 1997) ..............................................................15

*Garvin v. Progressive Cas. Ins. Co.,*
 2010 WL 1948593 (E.D. Pa. May 10, 2010)......................................28

*Gavurnik v. Home Properties, L.P.,*
 227 F. Supp. 3d 410 (E.D. Pa. 2017).......................................1, 25, 26

*Gray v. York Newspapers, Inc.,*
 957 F.2d 1070 (3d Cir. 1992) ......................................................passim

*Greer v. Mondelez Global, Inc.,*
 590 F. App'x 170 (3d Cir. 2014) .........................................................17

*Gresham v. Delaware Dep't of Health & Soc. Servs.,*
 821 F. App'x 146 (3d Cir. 2020) .........................................................46

*Hargrave v. Fibreboard Corp.,*
 710 F.2d 1154 (5th Cir. 1983) ............................................................45

*Huggins v. Coatesville Area Sch. Dist.,*
 2010 WL 4273317 (E.D. Pa. Oct. 29, 2010) ......................................36

*In re Bestwall LLC,*
 47 F.4th 233 (3d Cir. 2022) ................................................................45

*In re Diet Drugs,*
 706 F.3d 217 (3d Cir. 2013) ...............................................................45

*In re Imerys Talc Am., Inc.,*
 38 F.4th 361 (3d Cir. 2022) ................................................................45

*In re Ins. Brokerage Antitrust Litig.,*
 579 F.3d 241 (3d Cir. 2009) ...............................................................45

*In re Tribune Media Co.,*
 2017 WL 2622743 (D. Del. June 16, 2017) ........................................28

*Jaludi v. Citigroup,*
 933 F.3d 246 (3d. Cir. 2019) ..............................................................45

Jones v. SEPTA,
    796 F.3d 323 (3d Cir. 2015) ..........................................................passim

Joseph v. Leavitt,
    465 F.3d 87 (2d Cir. 2006) .......................................................24, 41

Kautz v. Met-Pro Corp.,
    412 F.3d 463 (3d Cir. 2005) ....................................................29, 43

Kier v. F. Lackland & Sons LLC,
    72 F. Supp. 3d 597 (E.D. Pa. 2014) ..................................................17

Kimble v. Marvel Ent., LLC,
    576 U.S. 446 (2015)..........................................................9, 12, 41

Kimber-Anderson v. City of Newark,
    502 F. App'x 210 (3d Cir. 2012) ...................................................37

Krohmer v. Am. Airlines, Inc.,
    2021 WL 3828150 (W.D. Pa. Aug. 27, 2021)...................................46

Lassalle v. Port Auth. of New York & New Jersey,
    2013 WL 6094339 (D.N.J. Nov. 19, 2013) ......................................38

Laurent-Workman v. Wormuth,
    54 F.4th 201 (4th Cir. 2022) .........................................................14

LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n,
    503 F.3d 217 (3d Cir. 2007) .........................................................26

Leftwich v. Lew,
    2015 WL 8773274 (E.D. Pa. Dec. 14, 2015)...................................18

Marten v. Godwin,
    499 F.3d 290, 295 (3d Cir. 2007) .................................................11

Massaro v. Wells Fargo Home Mortg.,
    2018 WL 4076319 (E.D. Pa. Aug. 24, 2018) ...................................17

Mandel v. M & Q Packaging Corp.,
    706 F.3d 157 (3d Cir. 2013) .........................................................32

Marrin v. Capital Health,
    2017 WL 2369910 (D.N.J. May 31, 2017)..........................................................29

Matos v. Merck & Co.,
    643 F. App'x 187 (3d Cir. 2016) .......................................................................29

May v. PNC Bank,
    434 F. Supp. 3d 284 (E.D. Pa. 2020)................................................................38

McDonnell Douglas Corp. v. Green,
    411 U.S. 792 (1973)..........................................................................................17

McEachin v. Beard,
    136 F. App'x 534 (3d Cir. 2005) .............................................................1, 10, 50

Michigan v. Bay Mills Indian Cmty.,
    572 U.S. 782 (2014)..........................................................................................12

Moore v. City of Phila.,
    461 F.3d 331 (3d Cir. 2006) .............................................................................26

Moore v. San Carlos Park Fire Prot. & Rescue,
    808 F. App'x 789 (11th Cir. 2020) ...................................................................15

National R.R. Passenger Corp. v. Morgan,
    536 U.S. 101 (2002)..............................................................................31, 32, 39

New Jersey Retail Merchs. Ass'n v. Sidamon-Eristoff,
    669 F.3d 374 (3d Cir. 2012) .......................................................................44, 45

Noland v. Swartz Campbell, LLC,
    2008 WL 598291 (W.D. Pa. Feb. 29, 2008)....................................................45

O'Connor v. City of Newark,
    440 F.3d 125 (3d Cir. 2006) ...........................................................31, 32, 33, 39

Oncale v. Sundowner Offshore Servs., Inc.,
    523 U.S. 75 (1998).............................................................................................13

Pantoja v. Am. NTN Bearing Mfg. Corp.,
    495 F.3d 840 (7th Cir. 2007) ...........................................................................46

Payne v. Tennessee,
    501 U.S. 808 (1991) ........................................................................... 12

Peltier v. United States,
    388 F.3d 984 (6th Cir. 2004) ........................................................ 24, 42

Pichler v. UNITE,
    542 F.3d 380 (3d Cir. 2008) ............................................................. 11

Planadeball v. Wyndham Vacation Resorts, Inc.,
    793 F.3d 169 (5th Cir. 2015) ............................................................ 46

Polansky v. Exec. Health Res. Inc.,
    17 F.4th 376, 382 n.5 (3d Cir. 2021) ....................................... 10, 44, 45

Poullard v. McDonald,
    829 F.3d 844 (7th Cir. 2016) ....................................................... 45, 46

Pugni v. Reader's Dig. Ass'n, Inc.,
    2007 WL 1087183 (S.D.N.Y. Apr. 9, 2007) ..................................... 45

Redd v. New York Div. of Parole,
    678 F.3d 166 (2d Cir. 2012) ............................................................. 14

Riley v. St. Mary Med. Ctr.,
    2014 WL 1632160 (E.D. Pa. Apr. 23, 2014) ................................... 32

Sarullo v U.S. Postal Serv.,
    352 F.3d 789 (3d Cir. 2003) ............................................................. 17

Schofield v. Metro. Life Ins. Co.,
    252 F. App'x 500, 503 (3d Cir. 2007) .............................................. 19

Seeney v. Elwyn, Inc.,
    409 F. App'x 570, 573 (3d Cir. 2011) .............................................. 20

Shaner v. Synthes,
    204 F.3d 494, 505 (3d Cir. 2000) ..................................................... 46

Sherrod v. Phila. Gas Works,
    57 F. App'x 68, 77 (3d Cir. 2003) .................................................... 36

_Simko v. United States Steel Corp._,
  992 F.3d 198, 206 (3d Cir. 2021) ................................................................44, 45

_Singletary v. Mo. Dep't of Corr._,
  423 F.3d 886 (8th Cir. 2005) ......................................................................24, 41

_Tepperwien v. Entergy Nuclear Operations, Inc._,
  663 F.3d 556 (2d Cir. 2011) ..............................................................................14

_Thomas v. Delaware State Univ._,
  626 F. App'x 384 (3d Cir. 2015) .......................................................................33

_Tourtellotte v. Eli Lilly & Co._,
  636 F. App'x 831 (3d Cir. 2016) ........................................................11, 17, 43

_Union Pac. R. Co. v. Greentree Transp. Trucking Co._,
  293 F.3d 120 (3d Cir. 2002) ..............................................................................45

_Vasquez v. Hillery_,
  474 U.S. 254 (1986).............................................................................................12

_Von Gunten v. Maryland_,
  243 F.3d 858 (4th Cir. 2001) ......................................................................24, 42

_Ward v. MBNA America_,
  962 F. Supp. 2d 680, 687 (D. Del. 2013) ...................................................25. 46

_Williams v. Borough of West Chester_,
  891 F.2d 458, 460 (3d Cir. 1989) ........................................................................1

_Woodard v. PHB Die Casting_,
  255 F. App'x 608, 609 (3d Cir. 2007) ...............................................................36

**Statutes**

12 C.F.R. § 326.3(b)(3) ........................................................................................ 22

42 U.S.C. § 2000e-5(e)(1) .................................................................................... 31

43 P.S. § 959(h) .................................................................................................... 31

**Other Authorities**

4 Bᴜs. & Cᴏᴍ. Lɪᴛɪɢ. Fᴇᴅ. Cᴛs. § 38:24 (5th ed.) .............................................. 11

Erwin Chemerinsky,
   Federal Jurisdiction 49 (Wolters Kluwer, 7th Ed. 2016) ........................... 43

Federal Judicial Center, Maintaining the Public Trust: Ethics for
   Federal Judicial Law Clerks, 8 (Federal Judicial Center, 4th Ed. 2019) ... 47

## I.    ISSUES PRESENTED FOR REVIEW

This appeal presents the following issue for review:

Whether the District Court properly granted summary judgment when the record revealed no genuine disputes of material fact and that BMT was entitled to judgment as a matter of law?

## II.    STATEMENT OF THE CASE[2]

As set forth more fully in BMT's statement of undisputed material facts that

accompanied its motion for summary judgment, Wandrea Russo, who self-

identifies as a Black woman, worked at BMT from 2014 until May 23, 2019.

(Appx92).  She resigned three months after she texted a friend "I'm meeting with

a[ttorney] Mark [Schwartz] sometime this weekend.  We are planning my exit

strategy.  I can't do this anymore.  It's not worth it.  I told him I have to be out by

April at the latest."  (Appx289-290, 295-296).

---

[2] Wandrea Russo did not include a statement of facts in her Statement Of The Case.  As a result, she violated Rule of Appellate Procedure 28(a)(6).  Rather than include the required statement of facts, Russo referred to various facts in the argument section of her brief.  She did so without regard to their chronological order.  Chronological order is, however, crucial in a Title VII case.  See, e.g., Gavurnik v. Home Properties, L.P., 227 F. Supp. 3d 410, 420-21 (E.D. Pa. 2017), aff'd, 712 F. App'x 170 (3d Cir. 2017) (noting that temporal proximity is something courts examine when determining whether a causal connection exists between protected activity and an adverse employment action in a retaliation case).  Moreover, many of the "facts" on which Russo relies are actually her allegations.  See, e.g., Russo Br. at 16, 26.  Allegations cannot be used to defeat summary judgment.  See, e.g., McEachin v. Beard, 136 F. App'x 534, 536 (3d Cir. 2005) (explaining that a party opposing summary judgment "may not simply reassert factually unsupported allegations contained in its pleading") (citations omitted); Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989) (same).

Russo alleges that Therese Trainer, her manager at BMT's Bryn Mawr branch from 2015 until June 2018,[3] made various racist comments during 2016 in the context of the presidential election and the Summer Olympics. (Appx194-195, 198-200, 202-203, 213-214). Russo also alleges that Trainer made comments in 2016 regarding an elderly customer who was belligerent after Russo would not assist the customer with a heavy safe deposit box. (Appx314-320, 398). Years after Trainer allegedly made these comments, Russo filed a complaint with the EEOC on April 29, 2018. (Appx93). Except for one comment that Russo thinks Trainer may have made in February 2018,[4] the incidents Russo complains about all took place more than 300 days before Russo filed her EEOC claim. (Appx194-211, 314-320, 365-367, 398, 520-521, 729; SAppx032-033, 037-038, 069-071, 080-081). Russo's only post-2018 claims regarding Trainer are that Trainer was difficult about scheduling a PTO day (which Russo was able to schedule), (Appx279-280, 750; SAppx108), that Trainer gave credit for the "sale" of a credit card to another teller that Russo thinks she should have received, (Appx383, 387;

---

[3] Trainer had no authority over, and no contact with, Russo during the nearly one year period between June 2018 when Trainer left the Bryn Mawr branch and May, 23, 2019 when Russo quit. (Appx442).

[4] Russo alleges that Trainer said that she was tired of Black people complaining and acting like victims. (Appx367-369; SAppx032, 037).

2

SAppx045-047), and that Trainer asked Russo to drive another teller between branches, which Russo never did.  (Appx445-446, 450, 542-543; SAppx109).

On April 27, 2018, two days before Russo filed her EEOC claim, Cathy Brown-Hinton, the (Black) assistant manager at the Bryn Mawr branch, discovered that a box holding keys had been taped shut, rather than locked.  (Appx235, 430, 499-500; SAppx098-101).  Hinton discovered this during an audit while Russo was out of the office.  (SAppx098-101).  Hinton also discovered that a teller had keys to a drawer assigned to another teller.  (SAppx098-101).  Shakeena Wilson, the (Black) backup head teller at the Bryn Mawr Branch, told BMT that she and Russo had taped the key box shut after discovering that the key was missing, and another teller reported that Russo had given her the incorrect keys.  (Appx239; SAppx095-101).  Although Russo denied both instances, she admitted that she should have been fired if she had taped the key box shut.  (Appx321; SAppx052-053).  BMT placed Russo on paid administrative leave while it investigated the issues surrounding the taping of the key box and the issuance of the keys.  (Appx289-290; SAppx027, 052-053).  Russo admitted that is it appropriate to take an employee's keys when they are placed on paid administrative leave.  (Appx619-620).

As the issue surrounding the taped key box was coming to light, Russo sent an email to Nicola Fryer (in human resources) claiming that Russo had found a key to her drive-through teller drawer in a bowl.  (SAppx048-051).  Fryer questioned

why Russo had sent the email to her (and only to her) because human resources had no involvement with bank security.  (SAppx048-051).  BMT investigated Russo's claim and determined that the key to which Russo referred was not to a cash drawer, but to the slot into which a teller places a cash drawer at the drive-through window.  (SAppx048-051).  As a result, there was no exposure or issue.  (SAppx048-051).  More importantly, BMT determined that, as head teller, Russo should have known the difference between a key to a cash drawer and a key to a slot into which a cash drawer could be placed, and that there was no exposure if a key to a slot into which a cash drawer could be placed was left out.  (SAppx048-051).

Immediately after BMT started its investigation into the taped key box, Russo filed her EEOC charge.  (Appx93).  After she filed her EEOC charge, her attorney sent a long letter to BMT's board.  (Appx99, 119-125;[5] SAppx028-029, 042-044).  BMT investigated the allegations in Russo's attorney's letter, and was unable to confirm that many of the alleged incidents occurred, or that any of the alleged incidents constituted racial discrimination or harassment.  (SAppx028-029, 042-044, 061-062).

---

[5] Russo's lawyer claims to have had his letter returned for non-delivery.  (Appx99).  However, the letter BMT received was sent after BMT had placed Russo on paid leave so that it could investigate the taped key box.  (SAppx027, 052-054).

When human resources interviewed Russo as part of its investigation into her complaints about Trainer and letter her attorney sent to BMT's board, they asked Russo if she could provide any dates she worked "off the clock." (SAppx055). Russo said that "she did not have dates and times to report" and "the time was minimal and she did not think it was worth reporting." (SAppx055). Russo then asked for her time records, which BMT supplied. (SAppx056-058). After reviewing her time records, Russo said she had not been paid for the full day on which she was placed on leave, or the next day. (SAppx059-060). BMT apologized, and paid her immediately. (Appx277-278; SAppx059-060).

When Russo returned from paid administrative leave,[6] human resources informed Russo that a reporter had called about Russo's EEOC claim. (Appx437-438; SAppx063-064). Russo seemed surprised, and said the story was not her idea, and was engineered by her attorney. (Appx221-222, 229-231, 437-440; SAppx063-064). Russo stated in her deposition that human resources told her that

_____

[6] Russo remained on paid leave for nearly a month. (SAppx027, 052-053). Russo's paid leave lasted so long because the video files of the vault (which would show who taped the key box shut) had been corrupted, and would not play. (SAppx027, 052-053). BMT was unable to fix the files and get them to play. (SAppx027, 052-053). When BMT determined that it would be unable to play the video, it closed its investigation because it could not be sure who had taped the key box shut. (SAppx027, 052-053). Wilson originally said Russo had taped the key box shut, but later said either she or Russo had done so, and Russo denied having done so. (SAppx052-053, 095-101). Russo was not disciplined, demoted, or docked pay as a result of or following the investigation. (Appx239-240, 719-720).

5

she needed to reach out to the reporter and tell him not to run the article. (Appx591).  Russo further stated that she was also told that once she went down that road, there was no turning back and that it was going to be very bad for her. (Appx591).  Additionally, Russo testified that human resources told her that it was a mistake to speak with the reporter and that an unidentified "they" would just drag her name through the mud and that it was not going to be very easy for her to get a job with her name out there that she is making claims.  (Appx591).  Russo stated that when she said she was fine with the article as long as it was factual, she was told she should think about it and that she should call the reporter and tell him not to run that article.  (Appx592).  This conversation between Russo and human resources strictly concerned Russo speaking with a reporter, and had nothing to do with Russo's underlying EEOC claim.  (Appx591-592).  Human resources never told or suggested that Russo should withdraw her EEOC claim.  (Appx591-592).  Ultimately, human resources informed Russo that "it was her complete right to contact or go to the press" and BMT was not trying to discourage her, but that the bank would be providing a response to the reporter.  (SAppx063-064).

A year later, a customer who had previously made remarks about race to Russo made a series of comments to Russo about race, abortion, and religion that caused Russo to believe (among other things) that the customer was "unstable." (Appx574, 626-628; SAppx085-087).  Russo notified her new manager and human

resources, who investigated that same day, including meeting with and interviewing Russo.  (Appx404-405; SAppx085-090).  When interviewed by BMT, the customer confirmed Russo's account, including that Russo had been uncomfortable.  (Appx255-256; SAppx091-092).  BMT de-marketed the customer, meaning the customer had thirty days to find a new bank.  (Appx423-424; SAppx030, 091-092).  Even though the customer wanted to apologize to Russo directly, BMT told the customer not to do so.  (SAppx030, 091-092).

The next day, human resources told Russo that the customer had been de-marketed.  (Appx408-410, 423-424; SAppx030, 091-092).  BMT's policy is to give de-marketed customers thirty days to redirect direct deposits and automatic withdrawals, mortgage payments, and the like.  (Appx410; SAppx026, 030, 110-111).  Human resources told Russo not to assist the customer if she came back, that they had told the customer not to come back to apologize to Russo, that the security guard was there if Russo felt nervous, and that the other employees in the branch would be told that the customer had been de-marketed and Russo should not assist her.  (Appx409-410, 423-424; SAppx030, 091-092).

In between her two meetings with human resources, Russo spoke with her lawyer – the same lawyer with whom she had been planning her exit strategy during the preceding three months.  (Appx289-290, 295-296, 207, 427; SAppx102-107).  After her second meeting with human resources, Russo told her manager she

was resigning, and later that night she emailed a resignation letter to BMT, stating that she had been constructively discharged because BMT gave the customer thirty days to find a new bank, rather than de-marketing her immediately.  (Appx424; SAppx093-094).  As set forth above, BMT's standard policy was to give de-marketed customers 30 days to find a new bank so that, *inter alia*, direct deposits and automatic payments could be redirected, and checks that had previously been written would not bounce.  (Appx410; SAppx026, 030).

## III.   SUMMARY OF ARGUMENT

Russo has explicitly asked this Court to transform Title VII into a civility

code, and to change the standard for finding constructive discharge from the

current objective standard to a subjective standard.  <u>See</u> Russo Br. 3, 12, 27.  This

Court should decline Russo's request to overrule the uniform precedent holding

that Title VII is not a civility code and that an objective standard governs

constructive discharge cases.  <u>See</u>, <u>e.g.</u>, <u>Kimble v. Marvel Ent., LLC</u>, 576 U.S. 446,

455 (2015) ("*stare decisis* . . . is a foundation stone of the rule of law.") (citation

omitted); <u>Burlington Northern & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 68

(2006) (Title VII is not a civility code); <u>Colwell v. Rite Aid Corp.</u>, 602 F.3d 495,

502-03 (3d Cir. 2010) (there is an objective standard for constructive discharge).

Under the applicable law, this Court should affirm because the trial court

correctly held that Russo did not suffer from an adverse employment action

because she voluntarily resigned, and every court that has examined the issue has

held that a paid suspension is not an adverse job action.  <u>See</u>, <u>e.g.</u>, <u>Jones v. SEPTA</u>,

796 F.3d 323, 326 (3d Cir. 2015); <u>see also</u> <u>Davis v. Legal Servs. Alabama, Inc.</u>, 19

F.4th 1261, 1266 (11th Cir. 2021) ("No Circuit has held that a simple paid

suspension, in and of itself, constitutes an adverse employment action.")

(collecting cases).  And even if Russo were to have suffered an adverse

employment action (which she did not), Russo failed to establish a link between

her protected activity and any subsequent adverse employment action. Russo also failed to proffer evidence that she was subject to a hostile work environment. Rather than proffering admissible evidence, Russo repeatedly cites both her allegations, <u>see</u> Russo Br. at 16, 26, and a letter written by her lawyer. <u>See</u> Russo Br. at 9, 25. Neither are admissible. As a result, neither can defeat summary judgment. <u>See</u>, <u>e.g.</u>, <u>McEachin v. Beard</u>, 136 F. App'x 534, 536 (3d Cir. 2005).

Finally, the EEOC's amicus brief also explicitly asks this Court to overturn what the EEOC acknowledges is universally applied law holding that a suspension with pay cannot constitute an adverse job action. <u>See</u> EEOC Br. at 27-28. This Court should reject the EEOC's invitation to be the first court to hold that a paid suspension can constitute an adverse job action, especially because Russo acknowledged that, if the allegations BMT was investigating during her paid suspension were proven, she should have been fired. (Appx321). As for the EEOC's claim that an unfulfilled threat can be actionable, the alleged unfulfilled threat did not relate to (and therefore could not deter) protected activity. As a result, it could not be actionable. And, in any event, Russo did not make the argument the EEOC advances in her own opening brief. It would be inappropriate for this Court to rely on such an argument advanced only by an amicus. <u>See</u> <u>Polansky v. Exec. Health Res. Inc.</u>, 17 F.4th 376, 382 n.5 (3d Cir. 2021), <u>cert. granted</u>, 142 S. Ct. 2834 (2022).

## IV.    STATEMENT OF THE STANDARD AND SCOPE OF REVIEW

Rule of Professional Responsibility 3.3 compels BMT to correct Russo's misstatement of the applicable standard of review.  Russo's brief argues that (i) "the court below abused its discretion," (ii) "the court below committed 'plain error,'" and (iii) "the court below engaged in fact finding that was clearly beyond its jurisdiction and erroneous."  Russo Br. at 4.  Given that none of these standards are correct, it is not surprising that Russo fails to cite a single case in support of her statement of the standard and scope of review.  See Russo Br. at 4.

In fact, "[b]ecause motions for summary judgment call upon a court to render judgment as a matter of law, appellate courts have uniformly held that there is de novo review of orders granting or denying summary judgment."  APPELLATE STANDARD OF REVIEW OF SUMMARY JUDGMENT ORDERS, 4 BUS. & COM. LITIG. FED. CTS. § 38:24 (5th ed.) (collecting cases); see also Pichler v. UNITE, 542 F.3d 380, 385 (3d Cir. 2008) ("We . . . review a grant or denial of summary judgment de novo, applying the same standard as the District Court.").

The scope of this Court's review, which Russo does not address in her brief, is plenary.  See Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007) ("In reviewing a grant of summary judgment we exercise plenary review and apply the same standard as the District Court.").

## V.    ARGUMENT

### A.    This Court Should Reject Russo's Invitation To Overrule Existing Law

Russo asks this Court to disregard and ultimately overrule existing law in two significant respects.  First, Russo repeatedly asks this Court to ignore years of precedent, including Supreme Court precedent, and be the first Court to ever hold that Title VII is a civility code.  <u>See</u> Russo Br. at 3, 27.  Second, Russo asks this Court to ignore years of precedent, and be the first Court to ever hold that the standard for finding a constructive discharge is a subjective standard, rather than an objective standard.  <u>See</u> Russo Br. at 12.  This Court should reject these invitations.

Precedent and "*stare decisis* is a foundation stone of the rule of law, necessary to ensure that legal rules develop in a principled and intelligible fashion."  <u>Michigan v. Bay Mills Indian Cmty.</u>, 572 U.S. 782, 798 (2014) (citations omitted); <u>see</u> <u>also</u> <u>Payne v. Tennessee</u>, 501 U.S. 808, 827 (1991) ("*Stare decisis* is the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process.");  <u>Vasquez v. Hillery</u>, 474 U.S. 254, 265-66 (1986).  As a result, "[o]verruling precedent is never a small matter."  <u>Kimble</u>, 576 U.S. at 455.  This Court should therefore reject Russo's invitation to overrule existing law.

### 1.    This Court Should Reject Russo's Invitation To Be The First Court To Ever Hold That Title VII Is A Civility Code

On two separate occasions, Russo explicitly asks this court to overrule existing law and turn Title VII into a civility code. <u>See</u> Russo Br. at 3 ("It is Plaintiff/Appellant's position that the civil rights laws indeed impose on employers a civility code"); Russo Br. at 27 ( "Appellant contends that the civil rights laws were create [sic] to impose a civility code"). The Supreme Court has repeatedly held that Title VII "does not set forth a general civility code for the American workplace." <u>Burlington Northern</u>, 548 U.S. at 68; <u>see also</u> <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788 (1998); <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 80-81 (1998). The Supreme Court reached this holding, and required a Title VII plaintiff to show "material adversity," because "it is important to separate significant from trivial harms." <u>Burlington Northern</u>, 548 U.S. at 68.

The Third Circuit has repeatedly followed suit, and has held that Title VII is not a civility code. <u>See</u>, <u>e.g.</u>, <u>Clarkson v. SEPTA</u>, 700 F. App'x 111, 115 (3d Cir. 2017) ("The antiretaliation provisions do not set forth a general civility code for the American workplace.") (citations omitted); <u>Tourtellotte v. Eli Lilly & Co.</u>, 636 F. App'x 831, 846 (3d Cir. 2016) ("Supreme Court hostile work environment jurisprudence states that the sufficiently demanding standards for judging hostility ensure that Title VII does not become a general civility code.") (citations omitted); <u>Davis v. City of Newark</u>, 417 F. App'x 201, 202 (3d Cir. 2011) (noting that "[n]ot

13

every complaint or report entitles its author to protection from retaliation under Title VII" and that Title VII does not set forth a general civility code for the American workplace) (citations omitted).  Other Circuits have done the same.  See, e.g., Davis v. Metro Parks & Recreation Dep't, 854 F. App'x 707, 713 (6th Cir. 2021); Redd v. New York Div. of Parole, 678 F.3d 166, 176 (2d Cir. 2012); Tepperwien v. Entergy Nuclear Operations, Inc., 663 F.3d 556, 568 (2d Cir. 2011); see also Laurent-Workman v. Wormuth, 54 F.4th 201, 217 (4th Cir. 2022) ("[T]he standards for judging hostility must be sufficiently demanding to ensure that Title VII does not become a general civility code.") (citations omitted).

No court has held to the contrary.  This Court should not be the first.

>        **2.**       **This Court Should Reject Russo's Invitation To Be The First Court To Ever Hold That The Standard For Finding Constructive Discharge Is A Subjective Standard, Rather Than An Objective Standard**

In addition to explicitly asking this Court to be the first to ever hold that Title VII is a civility code, Russo asks this Court to be the first to ever hold that the standard for finding a constructive discharge is a subjective standard, rather than an objective standard.  See Russo Br. at 11-13.

This Court has held that a constructive discharge only occurs when "the employer permitted conditions so unpleasant or difficult that a reasonable person would have felt compelled to resign."  Colwell, 602 F.3d at 502-03 (citations omitted).  In making this determination, a court employs an objective test and

14

"does not permit an employee's subjective perceptions to govern a claim of constructive discharge." Gray v. York Newspapers, Inc., 957 F.2d 1070, 1083 (3d Cir. 1992) (citations omitted); see also Colwell, 602 F.3d at 502.

Other circuits have reached the same conclusion. See, e.g., Moore v. San Carlos Park Fire Prot. & Rescue, 808 F. App'x 789, 798 (11th Cir. 2020) ("In evaluating constructive discharge claims, [courts] do not consider the plaintiff's subjective feelings. Instead, [they] employ an objective standard.") (citation omitted); Gartman v. Gencorp Inc., 120 F.3d 127, 130 (8th Cir. 1997) (explaining that a plaintiff must "show that a reasonable person in her situation would find the working conditions intolerable" and that "intolerability of working conditions is judged by an objective standard, not the [employee's] subjective feelings") (citations omitted); Bristow v. Daily Press, Inc., 770 F.2d 1251, 1255 (4th Cir. 1985), cert. denied, 475 U.S. 1082 (1986).

Indeed, Russo herself acknowledges that the applicable standard is an objective one. See Russo Br. at 13. Despite this acknowledgement, Russo rests her constructive discharge claim on her subjective sentiments and reactions. See Russo Br. at 11-13. Specifically, Russo claims that she "was afraid for her safety," "was literally in tears" when meeting with HR about BMT's de-marketing plan and policy, experienced chest pains, and had her hair falling out. See Russo Br. at 11-

15

13.[7]  Additionally, Russo stated in her resignation email that she considered "this constructive discharge as a result of the Bank's repeated failure to protect [her] and recognize [her] rights."  Russo Br. at 11-13.  Calling something a constructive discharge does not make it so, especially when the claim is based solely on a plaintiff's subjective experience.  See Gray, 957 F.2d at 1083.  Russo does not cite any evidence that show a "reasonable person" would be objectively compelled to resign.  This is because a reasonable person would understand not only that BMT was following its standard de-marketing procedure,[8] but that the standard procedure giving customers thirty days to find a new bank existed for a good reason, i.e. to prevent checks from bouncing, direct payments from failing, and direct deposits from being misdirected.  (Appx410; SAppx26, 30, 110-111).

No court has held to the contrary and allowed purely subjective feelings to justify a constructive discharge.  This Court should not be the first.

---

[7] BMT notes that while Russo argues that her hair fell out in the 24 hours between her encounter with the customer and her resignation and she sought medical attention during that 24 hour period, Russo presents no evidence or documentation showing she experienced any physical symptoms.  See Russo Br. at 12; (Appx570).

[8] Russo admitted that BMT followed its standard de-marketing procedure.  See Russo Br. at 12.

**B.      Under The Governing Law, The Trial Court Correctly Granted BMT's Motion for Summary Judgment**

The three-step burden shifting framework in McDonnell Douglas governs

Russo's claim under 42 U.S.C. § 1981, Title VII, and the Pennsylvania Human

Relation Act ("PHRA").  See 411 U.S. 792 (1973); Greer v. Mondelez Global,

Inc., 590 F. App'x 170, 172 & n.4 (3d Cir. 2014); Kier v. F. Lackland & Sons

LLC, 72 F. Supp. 3d 597, 607 n.1 (E.D. Pa. 2014).  Under McDonnell Douglas,

Russo must establish a prima facie case.  See Tourtellotte, 636 F. App'x at 842.  If

she does so, BMT must "articulate a legitimate, nonretaliatory or

nondiscriminatory reason for its action."  Tourtellotte, 636 F. App'x at 842.  If

BMT does so, "the burden then shifts back to the plaintiff to prove that the

employer's nonretaliatory or nondiscriminatory explanation is merely a pretext for

the discrimination or retaliation."  Tourtellotte, 636 F. App'x at 842.

Section 1981, Title VII, and PHRA claims for race discrimination have the

same elements for a prima facie case: (1) belonging to a protected class, (2)

performing one's job at a level that meets the employer's legitimate expectations,

(3) suffering an adverse employment action, and (4) circumstances that give rise to

an inference of unlawful discrimination.  See Sarullo v U.S. Postal Serv., 352 F.3d

789, 797 (3d Cir. 2003); Massaro v. Wells Fargo Home Mortg., 2018 WL 4076319

at *3 (E.D. Pa. Aug. 24, 2018), appeal dismissed, 2018 WL 7890260 (3d Cir. Oct.

18, 2018).

Russo cannot state a prima facie case because she did not suffer an adverse employment action: a paid suspension during an investigation is not an adverse employment action, and Russo was not constructively discharged. But even assuming that Russo could state a prima facie case (which she cannot), BMT is still entitled to summary judgment because it had a legitimate, non-discriminatory, non-pretextual reason (i.e. a facially neutral and neutrally applied bank policy) for suspending Russo with pay during its investigation and for giving the de-marketed customer thirty days to find a new bank, and there is no evidence that BMT applied this policy as a way to discriminate against Russo based on her race.[9]

### 1.   The Trial Court Correctly Found That Russo Did Not Suffer From An Adverse Employment Action

As noted above, to establish a prima facie claim, Russo must demonstrate that she suffered from an adverse employment action. She cannot do so because she voluntarily resigned from her position. While she asserts that she was subject to a constructive discharge, the evidence demonstrates that BMT followed its standard policy is allowing a de-marketed customer thirty days to close her

---

[9] "The central focus of the prima facie case is always whether the employer is treating some people less favorably than others because of their race." Leftwich v. Lew, 2015 WL 8773274 at *7 (E.D. Pa. Dec. 14, 2015), aff'd sub nom., Leftwich v. Sec'y, U.S. Dep't of Treasury, 741 F. App'x 879 (3d Cir. 2018). The inference of discrimination can be satisfied with, among other evidence, "comparator evidence, evidence of similar racial discrimination of other employees, or direct evidence from statements or actions by supervisors suggesting racial animus." Leftwich, 2015 WL 8773274 at *7.

account, and that policy did not create such an unendurable environment such that a reasonable person would have felt they had no other choice but to resign. Similarly, the fact that Russo was placed on paid administrative leave while BMT investigated a potential security breach cannot, as a matter of law, constitute an adverse employment action.

### a. Russo Voluntarily Resigned And Was Not Subject To A Constructive Discharge

Russo voluntarily resigned from her position at BMT, and was not constructively discharged, and therefore did not suffer an adverse employment action.  (Appx424; SAppx93-94); see also Schofield v. Metro. Life Ins. Co., 252 F. App'x 500, 503 (3d Cir. 2007) (affirming an employee who voluntarily resigns cannot show she suffered an adverse employment action at the hands of the employer); Fanelli v. Eye Consultants of Pennsylvania, PC, 2022 WL 79629 at *3 (E.D. Pa. Jan. 6, 2022) (noting that the Third Circuit has "not recognized voluntary resignations to be adverse employment actions") (citation omitted).

A constructive discharge only occurs when "the employer permitted conditions so unpleasant or difficult that a reasonable person would have felt compelled to resign."  Colwell, 602 F.3d at 502-03 (citations omitted).  A court employs an objective test, and "does not permit an employee's subjective perceptions to govern a claim of constructive discharge."  Gray, 957 F.2d at 1083 (citations omitted); see also Colwell, 602 F.3d at 502.  To determine whether an

employee was forced to resign, a court considers whether the employee was threatened with discharge, encouraged to resign, demoted, subjected to reduced pay, benefits or responsibilities, transferred to a less desirable position, or given unsatisfactory job evaluations. Colwell, 602 F.3d at 503. As Russo herself admitted, none of these factors apply. See Russo Br. at 14.

The trial court examined the circumstances surrounding Russo's employment, "including whether (1) she was threatened with discharge; (2) she was encouraged to resign; (3) she was demoted or suffered a reduction in pay or benefits; (4) she was involuntarily transferred to a less desirable position; (5) her job responsibilities were altered; and (6) she began receiving unsatisfactory job evaluations." (Appx13 (quoting Seeney v. Elwyn, Inc., 409 F. App'x 570, 573 (3d Cir. 2011))). The trial court found that "Russo has not provided any evidence suggesting that any of these factors contributed to her constructive discharge." (Appx13). The trial court then went further and observed that, in addition to failing to proffer evidence that any of the Seeney factors applied, "Russo fails to point to other fact and circumstances that establish that she was constructively discharged." (Appx13 (citations omitted)). The trial court concluded that "[t]he record clearly shows that Russo resigned because she was upset that the Bank provided a customer thirty days to end her relationship with the Bank rather than terminate that relationship immediately," and that while "Russo may have

'subjectively perceived' the Bank handled this incident in an 'objectionable manner,' [. . .] a reasonable employee would not have found the resulting working conditions – the possibility that an offensive customer might return to the branch – so 'unendurable' that they had no choice but to resign." (Appx13).  The trial court makes clear that, while Russo may have subjectively felt BMT's handling of the hostile customer was not sufficient, BMT's conduct was not egregious under the objective standard that is required for the constructive discharge analysis.

Rather than having been constructively discharged, Russo "deliberated her options carefully" and quit, either as part of her pre-planned exit strategy, (Appx289-290, 295-296), or because she "subjectively believed that continued employment would have been uncomfortable."  Gray, 957 F.2d at 1083; (Appx289-290, 295-296, 306-307).  Neither constitutes a constructive discharge. As this Circuit has explained,

> Every job has its frustrations, challenges, and disappointments. . . .  An employee is protected from a calculated effort to pressure her into resignation through the imposition of unreasonably harsh conditions …[the employee] is not, however, guaranteed a working environment free of stress.  The employment discrimination laws require as an absolute precondition to suit that some adverse employment action have occurred.  They cannot be transformed into a palliative for every workplace grievance, real or imagined, by the simple expedient of quitting.

Gray, 957 F.2d at 1083.

21

Given that BMT explicitly told both Russo, (Appx423-424; SAppx091-092), and her coworkers, (SAppx091-092), that Russo never again had to deal with the offending customer, and given that BMT actively worked to prevent the offending customer from speaking with Russo again, (Appx409-410, 423-424; SAppx091-092), there was no objectively unacceptable risk that Russo would find herself in a situation sufficiently stressful that a reasonable person would see no alternative but to quit.

While Russo claims she feared for her safety, such fear was objectively unreasonable. Russo admits there was a security guard at the branch. (Appx420-421). Additionally, as an FDIC-insured bank, BMT had "[a]n alarm system or other appropriate device for promptly notifying the nearest responsible law enforcement officers of an attempted or perpetrated robbery or burglary," pursuant to the FDIC's Minimum Security Devices and Procedures and Bank Secrecy Act Compliance regulation. 12 C.F.R. § 326.3(b)(3). As a result, there was no objective safety fear.

On the contrary, the facts demonstrate Russo's sentiments are purely subjective,[10] and no reasonable jury could have found BMT "permitted conditions

_____

[10] In her argument, Russo alleges that she exhibited physical symptoms, including chest pain and hair loss as a result of the incident with the hostile customer and the Bank's "inadequate response"; however, her resignation one day after the incident, and only a few hours after learning of BMT's planned de-marketing of the hostile customer pursuant to its standard practice, but after she spoke with her lawyer

so unpleasant or difficult that a reasonable person would have felt compelled to resign." <u>Colwell</u>, 602 F.3d at 502-03; <u>see also</u> <u>Gray</u>, 957 F.2d at 1083 (explaining that the constructive discharge analysis "does not permit an employee's subjective perceptions to govern").  As a result, the trial court correctly held that "a reasonable employee would not have found the resulting working conditions – the possibility that an offensive customer might return to the branch – so 'unendurable' that they had no choice but to resign."  (Appx13).

### b. A Paid Suspension Does Not Constitute An Adverse Employment Action

The Third Circuit has directly addressed the question of whether a paid suspension constitutes an adverse employment action, and has held that "[a] paid suspension pending an investigation of an employee's alleged wrongdoing does not fall under any of the forms of adverse action mentioned by Title VII's substantive provision." <u>Jones</u>, 796 F.3d at 326.  This holding is a specific application of the more general rule that "[a] suspension with pay, without more, is not an adverse employment action under the substantive provision of Title VII." <u>Jones</u>, 796 F.3d at 326.[11]  In this case, nothing "more" happened to Russo:  she was

_____

(Appx427), demonstrate that these were subjective, rather than objective, symptoms, because objectively significant symptoms did not have time to manifest.  (Appx409-410, 423-424; SAppx026, 030, 091-092, 110-111).

[11] In the <u>Jones</u> decision, the Third Circuit noted that "other courts of appeals have unanimously concluded that placing an employee on paid administrative leave

paid for all of her time while suspended, and although she was offended that BMT took her keys, she admits that it is appropriate to take a suspended employee's keys.  (Appx277-278, 719-720; SAppx059-060).  At the time of her suspension, BMT reasonably believed, based on the testimony of another Black employee, that Russo might have been responsible for taping the key box shut and failing to report the broken lock.  (SAppx095-101).  Even Russo admitted that, if she had been responsible for the breach, she should have been fired.  (Appx321).  As a result, there was nothing "more" than Russo's suspension with pay during a valid and appropriate investigation.

Based on this undisputed evidence, the trial court properly found that Russo did not show that her suspension with pay "contained something 'more' such that it could be an adverse employment action."  (Appx12 (citing Jones, 796 F.3d at 326)).  The trial court further explained that "[t]he record establishes that Russo

_____

where there is no presumption of termination is not an adverse employment action under the substantive provision of Title VII."  796 F.3d at 326 (citations omitted). Every circuit that has considered this question has reached the same conclusion. See Davis, 19 F.4th at 1266 ("No Circuit has held that a simple paid suspension, in and of itself, constitutes an adverse employment action.") (collecting cases); see also Joseph v. Leavitt, 465 F.3d 87, 91 (2d Cir. 2006) ("[A]dministrative leave with pay during the pendency of an investigation does not, without more, constitute an adverse employment action."); Singletary v. Mo. Dep't of Corr., 423 F.3d 886, 891–92 (8th Cir. 2005); Peltier v. United States, 388 F.3d 984, 988 (6th Cir. 2004); Von Gunten v. Maryland, 243 F.3d 858, 869 (4th Cir. 2001) (holding that "placing [an employee] on administrative leave with pay for a short time to allow investigation" is not an adverse action for retaliation purposes), abrogated on other grounds by Burlington Northern, 548 U.S. at 60.

24

was suspended in connection with the Bank's investigation into possible improper conduct related to security protocols and she was fully compensated during her suspension." (Appx12). The trial court's conclusion is correct under <u>Jones</u>.

2. **Even If This Court Were To Find That Russo Suffered An Adverse Employment Action, There Was No Link Between Her Protected Activity And The Subsequent Action To Establish A Claim For Retaliation**

Even if this Court were to find that Russo suffered an adverse employment action (which she did not), the undisputed facts show that there was no causal connection between Russo's protected activity and any potentially adverse employment action. To decide if there is a casual connection, courts look to "temporal proximity, intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for terminating the employee, or any other evidence sufficient to support the inference of retaliatory animus." <u>Gavurnik v. Home Properties, L.P.</u>, 227 F. Supp. 3d 410, 420-21 (E.D. Pa. 2017), <u>aff'd</u>, 712 F. App'x 170 (3d Cir. 2017) (citations omitted). Temporal proximity requires facts that "are unusually suggestive of retaliatory motive" to support an inference of causation. <u>See</u> <u>Escanio v. United Parcel Service</u>, 538 F. App'x 195, 200 (3d Cir. 2013). "With respect to the causation prong, the court considers whether a reasonable jury could link the employer's conduct to retaliatory animus." <u>Ward v. MBNA America</u>, 962 F. Supp. 2d 680, 687 (D. Del. 2013), <u>aff'd</u>, 570 F. App'x 143 (3d Cir. 2014). In the retaliation context, the action must be "materially

adverse," meaning it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Moore v. City of Phila., 461 F.3d 331, 341 (3d Cir. 2006), as amended (Sept. 13, 2006).

Regardless of whether it could be an adverse employment action (and under Jones it cannot be), Russo's suspension cannot be linked to Russo's protected activity because it took place before, rather than after, Russo filed her EEOC charge. (Appx93; SAppx003, 098-101). Similarly, regardless of whether it could be an adverse employment action (and under Colwell and Seeney it cannot be), Russo's decision to resign cannot be linked to Russo's protected activity because it took place nearly a year after Russo filed her EEOC charge. See LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 233 (3d Cir. 2007) (explaining that a gap of three months between "a protected activity and the adverse employment action, without more, cannot create an inference of causation and defeat summary judgment") (citing Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001)). Indeed, to the extent Russo's decision to resign is linked to anything, it is linked to her decision to work with her lawyer to plan her exit strategy, a plan that was formulated three months before she quit, and which was supposed to come to fruition one month before she quit. (Appx93, 194-195, 198-200, 289-290, 295-296, 408-409; SAppx003, 091-092, 102-107); Gavurnik, 227 F. Supp. 3d at 420-21 (explaining that to decide if there is a causal connection, courts

look to "temporal proximity, intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for terminating the employee, or any other evidence sufficient to support the inference of retaliatory animus") (citations omitted).

### 3.    Even If This Court Were To Find That Russo Suffered An Adverse Employment Action, There Was A Neutral Explanation For That Action

Even if this Court were to determine that Russo suffered an adverse employment action (which it should not do, for the reasons set forth above), Russo admits that the actions she claims were adverse were "neutral decisions." She admitted in her brief that BMT applied its standard policy, in its standard way, when it provided the de-marketed hostile customer thirty days to close her account. See Russo Br. at 11-12. And she admitted in her deposition that, if she had taped the key box shut, she should have been fired (and that it was permissible for BMT to take an employee's keys when that employee was suspended with pay pending an investigation). (Appx719-720). The trial court recognized that, while the de-marketing letter BMT sent to the customer stated that BMT was providing her with 30 days to close her accounts "as a courtesy," this language is standard and found in BMT's template reflecting BMT's standard policy. (Appx15; SAppx110-111). The trial court found that "the natural reading of this language in no way reflects a conscious, affirmative decision by the Bank to be particularly generous towards

this customer and give her more time to transition to a new financial institution than any other customer would have had." (Appx15).

"[I]t is well-established a court will not second-guess a company's business judgment or decisional process." Garvin v. Progressive Cas. Ins. Co., 2010 WL 1948593 at *7 (E.D. Pa. May 10, 2010) (citations omitted). As a result, Russo cannot prevail if BMT followed its standard procedures, and applied them to her in a neutral fashion. See Bazargani v. Haverford State Hosp., 90 F. Supp. 2d 643, 650 (E.D. Pa. 2000) (finding application of employer's standard policy a "legitimate, nondiscriminatory reason" for challenged conduct); see also In re Tribune Media Co., 2017 WL 2622743 at *9-10 (D. Del. June 16, 2017) (same). She can only prevail if she proffers evidence from which a reasonable jury could find that BMT's stated reasons for its actions (i.e. giving a customer being de-marketed thirty days to find a new bank, or suspending Russo with pay during the pendency of the investigation into who taped the key box shut after Shakeena Wilson, the (Black) assistant head teller, stated that Russo had done so) were pretextual. Russo failed to do so.

Whether Russo disagrees with BMT's decisions is "irrelevant" because it is the employer's "perceptions that matter and not what plaintiff claims to be the objective truth." Calero v. Cardone Indus., Inc., 2012 WL 2547356 at *12-13 (E.D. Pa. June 29, 2012) (citations omitted). Instead, to show that BMT's stated

28

reasons were pretextual, Russo must "come forward with evidence contradicting the core facts put forward by the employer as the reasons for its decision." Calero, 2012 WL 2547356 at *12; see also Kautz v. Met-Pro Corp., 412 F.3d 463, 467 (3d Cir. 2005). Such evidence would have to demonstrate "intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons," or evidence "sufficient to support the inference of retaliatory animus." Marrin v. Capital Health, 2017 WL 2369910 at *15 (D.N.J. May 31, 2017) (citations omitted). Showing pretext "places a difficult burden on the plaintiff," Capilli v. Whitesell Const. Co., 271 F. App'x 261, 265 (3d Cir. 2008), and rightfully so because "it is necessary in order to balance the goal of all discrimination law against our society's commitment to free decisionmaking by the private sector in economic affairs." Matos v. Merck & Co., 643 F. App'x 187, 191 (3d Cir. 2016) (citations omitted).

There are no inconsistencies regarding why BMT gave the de-marketed customer thirty days to find a new bank. BMT has always maintained that its existing policy provided de-marketed customers with thirty days to make new arrangements, consistent with customer's need to find a new bank and transfer any recurring deposits (such as paychecks) or withdrawals (such as mortgage payments) to their new accounts. (Appx410; SAppx026, 030, 110-111). Similarly, there are no inconsistencies regarding why BMT suspended Russo with

pay during its investigation into who taped the key box shut.  Russo herself admits

that it was proper for BMT to investigate, and that it would have been proper for

BMT to fire whoever had taped the key box shut.  (Appx321).  Given that the

employee who said Russo had taped the key box shut was Black, (Appx239;

SAppx095-097), there is no reasonable inference of racial animus.  Similarly,

given that the employee who said Russo had taped the key box shut also implicated

herself in the wrongdoing, (SAppx098-101), it was proper for BMT to treat the

allegation as sufficiently credible to warrant an investigation.  BMT is therefore

entitled to summary judgment even if Russo had proffered evidence that she

suffered an adverse job action (which she did not do).

### 4.    Russo Failed To Proffer Admissible Evidence Sufficient For A Jury To Find She Was Subject To A Hostile Work Environment

The trial court properly concluded that Russo failed to proffer admissible

evidence sufficient for a jury to find that she was subjected to a hostile work

environment in violation of Title VII or the PHRA because most of the alleged

conduct Russo complains of is time-barred, the only potentially timely occurrences

are isolated incidents insufficient to alter the terms and conditions of Russo's

employment, and none of the conduct alleged demonstrates intentional, severe, or

pervasive discrimination on the basis of race.

a.    **The Trial Court Correctly Held That The Continuing Violation Doctrine Does Not Apply To Russo's Claims**

Although Russo complains about a number of comments she says Trainer made, Russo claims that all but one of those comments occurred in 2016. (Appx194-211, 314-320, 365-367, 398, 520-521, 729; SAppx032-033, 037-038, 069-071, 080-081).  Any events occurring before July 3, 2017 are time-barred.  See 42 U.S.C. § 2000e-5(e)(1) (Title VII); 43 P.S. § 959(h) (PHRA).  As a result, Trainer's alleged comments about Donald Trump, anti-abortion meetings, not liking Russo's boots, Irish slavery, Jamaicans during the 2016 Summer Olympics, and assisting an elderly customer with a safe deposit box, cannot give rise to claims because the applicable statute of limitations has run.  (Appx194-211, 314-320, 365-367, 398, 520-521, 729; SAppx032-033, 037-038, 069-071, 080-081).

Employment discrimination claims are divided into discrete acts or continuing violations.  See National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 110-118 (2002).  For statute of limitations purposes, a discrete act occurs on the day it happened, and "discrete discriminatory acts are not actionable if time barred, even when they are related to acts allegedly in timely filed charges." Morgan, 536 U.S. at 113.  Termination, failure to promote, and denial of transfer are discrete acts.  See Morgan, 536 U.S. at 114.  Wrongful suspension, wrongful discipline, and wrongful accusations are also discrete acts.  See O'Connor v. City

of Newark, 440 F.3d 125, 127 (3d Cir. 2006).[12]  Discrete acts outside of the

limitations period "are untimely filed and no longer actionable."  Morgan, 536 U.S.

at 114-15.

A continuing violation involves "acts which are not individually actionable

but may be aggregated to make out a hostile work environment claim."  O'Connor,

440 F.3d at 127.  This type of violation "is based on the cumulative effect of a

thousand cuts, rather than on any particular action taken by the defendant."

O'Connor, 440 F.3d at 128.  Continuing violation acts "can occur at any time so

long as they are linked in a pattern of actions which continues into the applicable

limitations period."  Charles v. Mott's LLP, 2018 WL 2002794 at *4 (D.N.J. Apr.

30, 2018).  To show a continuing violation, a plaintiff must show "that all acts

which constitute the claim are part of the same unlawful employment practice and

that at least one act falls within the applicable limitations period."  Mandel v. M &

Q Packaging Corp., 706 F.3d 157, 165-66 (3d Cir. 2013).  A plaintiff can only rely

on those "acts which are not individually actionable but may be aggregated to

make out a hostile work environment claim."  O'Connor, 440 F.3d at 127; accord

Riley v. St. Mary Med. Ctr., 2014 WL 1632160 at *4 (E.D. Pa. Apr. 23, 2014)

(plaintiff cannot show a pattern sufficient to support an ongoing violation with a

---

[12] As set forth above, a paid suspension, without more, is not an adverse
employment action.  See Jones, 796 F.3d at 326.

termination because termination is actionable on its own).  Discrete acts which are time barred "cannot be aggregated under a continuing violations theory." O'Connor, 440 F.3d at 127, 129.

The only comment with racial content Trainer allegedly made that might be within the limitations period is an alleged incident in February 2018 when Trainer supposedly said she was tired of Black people acting like victims.  (Appx367-369; SAppx032, 037).  Leaving aside the fact that Russo's claim that Trainer made this statement is contradicted by other evidence in the record, (Appx119-125, SAppx055); see also Thomas v. Delaware State Univ., 626 F. App'x 384, 389 n.6 (3d Cir. 2015) (explaining that plaintiff's unsupported deposition testimony that was contradicted by the record was insufficient to defeat summary judgment), the alleged statement, even if made, does not meet the standards to create a hostile work environment as discussed at length in the following section.

Moreover, as the trial court found, even if Trainer's comment could be used as the basis for continuing violation theory, enabling the court to consider the time-barred conduct, Russo's claim of hostile work environment fails to survive summary judgment.  (Appx24).  The trial court recognized that Trainer's statements about race made over the course of approximately two years, while potentially inappropriate, "do not rise to the level of being sufficiently severe or pervasive to establish a *prima facie* case of a hostile work environment."

(Appx24); see also Exantus v. Harbor Bar & Brasserie Rest., 386 F. App'x 352, 354 (3d Cir. 2010) (affirming summary judgment for defendant on hostile work environment claim because the use of "unpalatable and inappropriate" racial epithets was not "pervasive and severe").  The trial court also noted that "Trainer's comments were 'not particularly frequent' and were 'not physically threatening or humiliating.'"  (Appx24 (citing Brooks v. CBS Radio, Inc., 342 F. App'x 771, 777 (3d Cir. 2009)).  Furthermore, the trial court concluded that the statements were not sufficiently severe or pervasive to alter the terms and conditions of Russo's employment, and therefore did not constitute a hostile work environment. (Appx25 (collecting cases)).  Finally, the remaining conduct within the statute of limitations also cannot be used to bring in the time-barred comments because those incidents are the kind of non-racial pettiness and managerial oversight insufficient to create a hostile work environment and are not part of an actionable "pattern" of conduct related to race.  See Charles, 2018 WL 2002794 at *4.

> b.  **The Only Timely Incidents Offered By Russo Are Not Sufficient To Establish A Hostile Work Environment And Have A Neutral, Non-Pretextual, Explanation**

Because the continuing violation doctrine does not apply, this Court need only examine alleged conduct that occurred after July 3, 2017.  None of the post-July 3, 2017 allegations rise to the level of a hostile work environment.  A prima facie case of hostile work environment requires (1) intentional discrimination

because of race, (2) that was severe or pervasive, (3) that detrimentally affected the plaintiff, (4) that would have detrimentally affected a reasonable person of the same race in plaintiff's position, and (5) a basis for employer liability. See Fenter v. Mondelez Global LLC, 574 F. App'x 213, 217 (3d Cir. 2014). To survive summary judgment, a plaintiff must offer "sufficient evidence to give rise to an inference of discrimination by offering proof that her workplace was permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment, and the conduct was based on her [race]." Fichter v. AMG Resources Corp., 528 F. App'x 225, 230-31 (3d Cir. 2013). The "severe or pervasive" prong requires discrimination that alters the terms and conditions of employment, not offhand comments and isolated incidents. See Faragher, 524 U.S. at 786. "These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code. Properly applied, they will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." Faragher, 524 U.S. at 788.

The hostility of a work environment is measured based on the totality of the circumstances, such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance;

and whether it unreasonably interferes with an employee's work performance."
See Fichter, 528 F. App'x at 230.  Unless extremely severe, offhand comments and
isolated incidents are insufficient to sustain a hostile work environment.  See
Woodard v. PHB Die Casting, 255 F. App'x 608, 609 (3d Cir. 2007).  Neither are
comments that are "subject to a non-racial interpretation" and "not physically
threatening or humiliating."  Sherrod v. Phila. Gas Works, 57 F. App'x 68, 77 (3d
Cir. 2003).

The trial court concluded that Trainer making the statement that "she was
tired of Black people complaining and acting like victims" in February 2018 was
"not severe or pervasive enough to alter the terms and conditions of Russo's
employment."  (Appx25 (collecting cases)).  In her brief, Russo does not argue that
it was severe, pervasive, or altered the terms and conditions of her employment.
See Russo Br. at 24-26.  Instead, Russo first claims that this Court should be the
first to hold that Title VII is a civility code, see Russo Br. at 3, 27, (which this
Court should not, for the reasons set forth above), and refers to other alleged
statements.  See Russo Br. at 24-25.  None of Russo's arguments change the fact
that Trainer's alleged single comment that she was tired of Black people
complaining and acting like victims "falls into the category of isolated and offhand
comments, and although inappropriate, cannot be considered to have altered the
terms and conditions" of employment.  See Huggins v. Coatesville Area Sch. Dist.,

2010 WL 4273317 at *6 (E.D. Pa. Oct. 29, 2010).  Although Russo claims that this

single statement is a "racist diatribe," <u>see</u> Russo Br. at 25, a single statement is not

(and cannot be) a diatribe.  <u>See</u> Oxford English Dictionary (defining diatribe as a

dissertation or discourse directed against some person or work; a bitter and violent

criticism; an invective); Merriam-Webster Dictionary (defining diatribe as "a bitter

and abusive speech or piece of writing).[13]

Aside from the statement that "she was tired of Black people complaining

and acting like victims," the only potentially actionable conduct on which the

statute of limitations had not yet run is that Trainer was difficult about scheduling a

PTO day (which Russo in fact scheduled, (Appx279-280, 750; SAppx108)),

Trainer gave a $25 credit to another teller that Russo thinks she should have

received, (Appx383, 387; SAppx045-047), and Trainer asked Russo to drive

another teller between branches, which Russo never did.  (Appx279-280, 383, 387,

750; SAppx109).  Animosity, being yelled at, and petty signs of disrespect do not

constitute a hostile work environment.  <u>See</u> <u>Kimber-Anderson v. City of Newark</u>,

502 F. App'x 210, 214 (3d Cir. 2012) (upholding summary judgment on a hostile

---

[13] Russo claims in her brief that the trial court acknowledged that what Russo had experienced was "inexcusable."  Russo Br. at 3.  The trial court never made such statement, but rather stated that its decision "should not be interpreted as condoning the Bank's or its employees' actions," but nevertheless found that "Russo has failed to put forth sufficient facts to defeat the Bank's motion for summary judgment."  (Appx26).

work environment claim based on an increased workload, two instances of foul language directed to plaintiff, and intense animosity); <u>Lassalle v. Port Auth. of New York & New Jersey</u>, 2013 WL 6094339 at *14 (D.N.J. Nov. 19, 2013) (being yelled at, accused of lying, overworked, and having a light turned off while an employee was still in the room over a nine month period did not create a hostile work environment).  Managerial oversight, even when frustrating to the plaintiff, does not constitute a hostile work environment.  <u>See</u> <u>Charles</u>, 2018 WL 2002794 at *4.  Trainer's resistance to helping Russo schedule a PTO day (which Russo did receive), (Appx279-280, 759; SAppx108), is in the nature of either petty disrespect or frustrating managerial oversight, as is Trainer's decision to award sales credit to another teller.  (Appx383, 387; SAppx045-047).  And so is Russo's allegation that Trainer asked her to drive another teller from one branch to another – something which Russo admits she never had to do.  (Appx450, 542-543; SAppx109).  Russo may have felt that these events were disrespectful or unwarranted from a business perspective, but there is no evidence that there was racial motivation for any of them.  "It is well-settled that an employee's subjective perceptions, without more, cannot raise an inference that a plaintiff's protected trait was the motivating or determinative factor in an employer's adverse employment action."  <u>May v. PNC Bank</u>, 434 F. Supp. 3d 284, 300 (E.D. Pa. 2020).

38

Nor can any of this conduct be aggregated with other conduct, such as Russo's paid administrative leave or resignation, to create a hostile work environment. As noted above, discrete acts that would be actionable on their own, like termination, failure to promote, denial of transfer, wrongful suspension, wrongful discipline, and wrongful accusations, cannot be aggregated with individual incidents that are non-actionable to create a hostile work environment claim. See Morgan, 536 U.S. at 114; O'Connor, 440 F.3d at 127. Moreover, the trial court properly held that the continuing violation doctrine does not apply. BMT is therefore entitled to summary judgment on Russo's hostile work environment claim.

### C.    This Is Not The Appropriate Case For This Court To Accept The EEOC's Invitation To Overrule Settled Law

In its amicus brief, the EEOC asks this Court to reverse the trial court's grant of summary judgment by overruling Jones v. SEPTA, 796 F.3d 323, 326 (3d Cir. 2015), and holding that a paid suspension "when based on race" should be actionable as an adverse employment action. See EEOC Br. at 23-29. This Court should not should not do so because (a) doing so would violate *stare decisis* and this Court's internal operating procedures and (b) Russo has admitted that her suspension was based on BMT's neutrally applied policies, specifically its need to investigate a claim that, if true, would, in Russo's own eyes, justify her termination.

The EEOC also asks this Court to reverse the trial court's grant of summary judgment because the EEOC believes that an unfulfilled threat can constitute a materially adverse job action.  <u>See</u> EEOC Br. at 8-22.  This Court should not do so because (a) Russo did not argue that the trial court should be reversed because an unfulfilled threat can constitute a materially adverse job action, and an amicus cannot advance arguments that were not advanced by the parties, (b) the unfulfilled threat about which the EEOC complains is not related to protected activity, and was instead an effort to dissuade Russo from speaking with the press (which BMT was allowed to do), and (c) Russo did not proffer any evidence that the unfulfilled threat could have been "material" (and the EEOC explicitly takes no position on whether it was).

### 1.    This Court Should Not Reverse The Trial Court's Grant Of Summary Judgment By Overruling <u>Jones</u>

This case is not the proper forum for the EEOC to set forth its position that a paid suspension can constitute an adverse employment action.  This is because the EEOC's argument asks this Court to both overrule existing law in the Third Circuit and to disregard the law that has been consistently set forth in other circuits.  And even if this Court were inclined to ignore its binding precedent, accepting the EEOC's position would not alter the ultimate outcome because Russo admitted that her suspension was based on BMT's neutral policies, so the EEOC is asking this Court to render an advisory opinion.

40

a.    ***Stare Decisis*, And This Court's Internal Operating Procedures, Preclude This Panel From Overruling <u>Jones</u>**

In its brief, the EEOC acknowledges that "[a]s published precedent, <u>Jones</u> is binding on this Court and thus, for now, would foreclose Russo's discrimination claim. . . ." <u>See</u> EEOC Br. at 24.  The EEOC therefore acknowledges that it would not be appropriate for this Court to overrule <u>Jones</u>.  <u>See</u> EEOC Br. at 29 (noting that "the EEOC invites this Court to revisit <u>Jones</u> at the appropriate time).  This is because both *stare decisis* and this Court's internal operating procedures preclude this Court from overruling previously published precedents such as <u>Jones</u>.  <u>See, e.g.</u>, <u>Kimble</u>, 576 U.S. at 455; INTERNAL OPERATING PROCEDURES OF THE UNITED STATES COURT OF APPEAL FOR THE THIRD CIRCUIT 9.1 ("It is the tradition of this court that the holding of a panel in a precedential opinion is binding on subsequent panels.  Thus, no subsequent panel overrules the holding in a precedential opinion of a previous panel.  Court en banc consideration is required to do so.").

In addition to violating *stare decisis* and I.O.P. 9.1, overruling <u>Jones</u> would, as the EEOC again admits, create a circuit split where none currently exists.  <u>See</u> EEOC Br. at 27.  Indeed, <u>Jones</u> recognized that every other circuit to consider the issue has held that a paid suspension alone is not an adverse employment action.  See <u>Jones</u>, 796 F.3d 326 (citing <u>Joseph v. Leavitt</u>, 465 F.3d 87, 91 (2d Cir. 2006) ("[A]dministrative leave with pay during the pendency of an investigation does

not, without more, constitute an adverse employment action."); <u>Singletary v. Mo. Dep't of Corr.</u>, 423 F.3d 886, 891–92 (8th Cir. 2005); <u>Peltier v. United States</u>, 388 F.3d 984, 988 (6th Cir. 2004) (finding that a plaintiff who was put on administrative leave pending the outcome of an investigation and was restored to her position upon the termination of the investigation did not suffer an adverse employment action); <u>see also</u> <u>Von Gunten v. Maryland</u>, 243 F.3d 858, 869 (4th Cir. 2001) (holding that "placing [an employee] on administrative leave with pay for a short time to allow investigation" is not an adverse action for retaliation purposes), <u>abrogated on other grounds</u> by <u>Burlington Northern</u>, 548 U.S. at 60; <u>Breaux v. City of Garland</u>, 205 F.3d 150, 158 (5th Cir. 2000) (placement on paid administrative leave is not an adverse action for purposes of a First Amendment retaliation claim)).  Therefore, the EEOC asks this Court to not only disregard its own holding, but to also ignore its sister circuits that have consistently found that a paid suspension alone is not an adverse employment action under Title VII.

### b.    Russo Has Admitted That Her Suspension Was Based On BMT's Neutrally Applied Policies

Even if this court were to adopt the EEOC's position and conclude that under certain circumstances a paid suspension may constitute an adverse employment action, Russo's claim would still fail because she admitted that her suspension was based on BMT's neutral policies, namely its need to investigate a claim that, if proven, should lead to her termination.  (Appx321).  The fact that

BMT would have applied its neutral policy to suspend with pay Russo during its investigation, and the fact that Russo did not proffer any admissible evidence of pretext, renders summary judgment appropriate even if Russo's paid suspension was an adverse employment action (which it was not, under <u>Jones</u>).  (Appx719-720).  <u>See</u> <u>also</u> <u>Tourtellotte</u>, 636 F. App'x at 842; <u>Kautz</u>, 412 F.3d at 467; <u>Calero</u>, 2012 WL 2547356 at *12.  As a result, the EEOC is asking this Court to render an advisory opinion.  This Court should not do so.  <u>See</u> ERWIN CHEMERINSKY, FEDERAL JURISDICTION 49 (Wolters Kluwer, 7th Ed. 2016).

### 2.  This Court Should Not Reverse The Trial Court's Grant Of Summary Judgment Based On An Unfulfilled Threat

The EEOC's request that this Court reverse based on an unfulfilled threat goes beyond Russo's arguments, and is therefore improper.  In addition to being procedurally improper, the unfulfilled threat to which the EEOC refers does not relate to protected activity, and therefore cannot give rise to a claim.  Finally, even if an unfulfilled threat could give rise to a claim, Russo failed to proffer admissible evidence that the alleged threat was material.  As a result, this Court should decline the EEOC's request to reverse the trial court.

### a.  The EEOC Is Making An Argument That Russo Did Not Make

"An amicus normally cannot expand the scope of an appeal with issues not presented by the parties on appeal, at least not in cases where the parties are

competently represented by counsel." Simko v. United States Steel Corp., 992

F.3d 198, 206 (3d Cir. 2021), cert. denied sub nom., Simko v. United States Steel

Corp., 142 S. Ct. 760 (2022); see also DiBiase v. SmithKline Beecham Corp., 48

F.3d 719, 731 (3d Cir. 1995) (stating "an amicus may not frame the issues for

appeal") (citation omitted); Polansky, 17 F.4th at 382 (The Third Circuit "generally

avoid[s] considering arguments raised solely in amicus briefs where[, as here,] the

parties are competently represented by counsel.") (citations omitted); New Jersey

Retail Merchs. Ass'n v. Sidamon-Eristoff, 669 F.3d 374, 382 n.2 (3d Cir. 2012)

("Although an *amicus* brief can be helpful in elaborating issues properly presented

by the parties, it is normally not a method for injecting new issues into an appeal,

at least in cases where the parties are competently represented by counsel.")

(citations omitted).

　　　Russo did not raise the issue of whether the alleged threat not to speak with

the newspaper constituted an adverse employment action. See Russo Br. at 22.

Indeed, Russo's brief makes only a single passing reference to the alleged threat.

See Russo Br. at 22. Russo does not make any argument based on that alleged

threat. See Russo Br. at 22. Her failure to do so is not surprising because Russo

only made a single mention of the alleged unfulfilled threat in her brief to the trial

court, saying that BMT's head of HR allegedly said "that 'things would be bad' if

she didn't kill the story." See Russo Tr. Br. at 24. Russo made no argument to the

trial court based on the alleged unfulfilled threat.  See Russo Tr. Br. at 24.  As a

result, this Court should not consider any such argument, either from Russo, see

F.D.I.C. v. Deglau, 207 F.3d 153, 169 (3d Cir. 2000) (refusing to consider an

argument not raised in the opening brief); see also In re Imerys Talc Am., Inc., 38

F.4th 361, 372 (3d Cir. 2022); In re Bestwall LLC, 47 F.4th 233, 242 (3d Cir.

2022); In re Diet Drugs, 706 F.3d 217, 226-27 (3d Cir. 2013); In re Ins. Brokerage

Antitrust Litig., 579 F.3d 241, 262 (3d Cir. 2009); Union Pac. R. Co. v. Greentree

Transp. Trucking Co., 293 F.3d 120, 126 (3d Cir. 2002); c.f. Poullard v.

McDonald, 829 F.3d 844, 855 (7th Cir. 2016) ("It is well established that

arguments not presented to the district court are waived on appeal."),[14] or the

EEOC.  See Simko, 992 F.3d at 206; DiBiase, 48 F.3d at 731; Polansky, 17 F.4th

at 382; New Jersey Retail Merchs. Ass'n, 669 F.3d at 382 n.2.[15]

---

[14] Because Russo did not raise this issue in her opening brief, she cannot raise it her reply brief.  See, e.g., Jaludi v. Citigroup, 933 F.3d 246, 256 n.11 (3d. Cir. 2019); Hargrave v. Fibreboard Corp., 710 F.2d 1154, 1164 (5th Cir. 1983).

[15] Although this Court should not consider the EEOC's argument because Russo did not make it, BMT notes that the EEOC's brief admits that the cases upon which the trial court relied hold that statements like the one cited by Russo – "things would be bad" – are not actionable.  See EEOC Br. at 18-19 (stating that the trial court relied upon "Raffaele v. Potter, 2012 WL 33035, at *7-9 (E.D. Pa. Jan. 6, 2012) (supervisor's comment that employee "did not know who he was dealing with" neither qualified as a threat nor could dissuade a reasonable worker from engaging in protected activity); Noland v. Swartz Campbell, LLC, 2008 WL 598291 at *5, *20 (W.D. Pa. Feb. 29, 2008) (employer's comment that "if he were [plaintiff] he would have quit" was not materially adverse) (alteration in original); Pugni v. Reader's Dig. Ass'n, Inc., 2007 WL 1087183, at *23 (S.D.N.Y. Apr. 9,

b.    **The Alleged Unfulfilled Threat Does Not Relate To Protected Activity**

To constitute actionable retaliation, an event must relate to protected activity.  See, e.g., Burlington Northern, 548 U.S. at 68; E.E.O.C. v. Allstate Ins. Co., 778 F.3d 444, 449 (3d Cir. 2015), as amended on reh'g in part (Mar. 26, 2015); Fogleman v. Mercy Hosp., Inc., 283 F.3d 561, 567 (3d Cir. 2002); Ward, 962 F. Supp. 2d at 687.  The alleged unfulfilled threat about which the EEOC complains does not, however, relate to protected activity.  See Gresham v. Delaware Dep't of Health & Soc. Servs., 821 F. App'x 146, 152 (3d Cir. 2020)

---

2007) (employer's comment that plaintiff's days were "numbered" was not materially adverse.").  In contrast, the cases relied upon by the EEOC involve specific threats of adverse employment actions, such as termination.  See, e.g., Planadeball v. Wyndham Vacation Resorts, Inc., 793 F.3d 169, 178 (5th Cir. 2015) (a jury could reasonably conclude that multiple threats to fire the plaintiff was a material adverse action); Pantoja v. Am. NTN Bearing Mfg. Corp., 495 F.3d 840, 849 (7th Cir. 2007) (a factfinder could conclude that disciplinary warnings were materially adverse); see also Cox v. Onondaga Cnty. Sheriff's Dep't, 760 F.3d 139, 148 (2d Cir. 2014) (threats of bringing false report charges could be materially adverse); Billings v. Town of Grafton, 515 F.3d 39, 54-55 (1st Cir. 2008) (a threat of "further, more serious discipline" could be materially adverse).  Vague threats, especially those that do not relate to the protected activity of filing an EEOC charge, are not actionable.  See Poullard, 829 F.3d at 856 (finding that "threats of unspecified disciplinary action do not constitute adverse actions").  This is because the filing of an EEOC charge does not insulate an employee from either discipline or the generalized potential for workplace unpleasantness.  See Shaner v. Synthes, 204 F.3d 494, 505 (3d Cir. 2000) ("[I]t is important that an employer not be dissuaded from making what he believes is an appropriate evaluation by a reason of a fear that the evaluated employee will charge that the evaluation was retaliatory."); Krohmer v. Am. Airlines, Inc., 2021 WL 3828150 at *23 (W.D. Pa. Aug. 27, 2021) (explaining that "a plaintiff cannot insulate himself from adverse action by repeatedly engaging in protected activity").

(finding the plaintiff offered "insufficient evidence to show that she suffered

adverse employment action <u>because</u> she engaged in [. . .] protected activities")

(emphasis in original).  On the contrary, the alleged unfulfilled threat arose out of

talking to a reporter.  (Appx591-592).  Speaking with a reporter is not a protected

activity.  <u>See</u>, <u>e.g.</u>, <u>Garcetti v. Ceballos</u>, 547 U.S. 410, 418 (2006) (noting that

private employers "need a significant degree of control over their employees'

words and actions").  Many employers, including BMT, have restrictions

surrounding employees speaking with the press about their employers.  <u>See</u>, <u>e.g.</u>,

SAppx160 ("All inquiries from the media, including telephone inquiries from

reporters, should immediately be referred to the Marketing Department who will

respond to the media inquiry.  Employees are not to release statements on behalf of

BMT to the media, but instead are to obtain contact information for the reporter

and indicate that an appropriate BMT representative will contact them."); FEDERAL

JUDICIAL CENTER, MAINTAINING THE PUBLIC TRUST: ETHICS FOR FEDERAL JUDICIAL

LAW CLERKS, 8 (Federal Judicial Center, 4th Ed. 2019) (stating that while

journalists may ask for information about a case or the court, "law clerks should

not disclose any confidential information or comment publicly on the merits of any

pending or impending actions," further noting that "[m]any judges prohibit their

clerks from talking to the media").  As a result, the alleged unfulfilled threat could

not constitute retaliation.

### c.    Russo Failed To Proffer Admissible Evidence That The Unfulfilled Threat Was Material

In <u>Burlington Northern</u>, the Supreme Court held that "[t]he antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." 548 U.S. at 67. The Court further found that, for a retaliation claim, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." <u>Burlington Northern</u>, 548 U.S. at 67 (citations omitted).

Russo did not proffer any admissible evidence that the alleged unfulfilled threat was materially adverse, or could have "dissuaded a reasonable worker from making or supporting a charge of discrimination." <u>Burlington Northern</u>, 548 U.S. at 67. On the contrary, the only evidence Russo proffered was that the alleged unfulfilled threat *did not* prevent her from speaking with the reporter. (Appx221-222, 229-231). The EEOC admits as much. <u>See</u> EEOC Br. at 5. Neither Russo nor the EEOC cites any admissible evidence that the alleged unfulfilled threat rose to the level that would dissuade a reasonable employee from engaging in protected activity. On the contrary, the admissible evidence demonstrated that BMT had a neutral policy prohibiting employees from talking to the press. (SAppx160). As a result, the grant of summary judgment should be affirmed because Russo did not

proffer sufficient admissible evidence to defeat a motion for summary judgment.

See, e.g., McEachin, 136 F. App'x at 536.

## VI.    CONCLUSION

This Court should not overrule existing law, be it Jones (which holds that a

suspension with pay cannot be an adverse employment action), Burlington

Northern (which holds that Title VII is not a civility code), Colwell (which holds

that an objective standard governs constructive termination cases), or Polansky

(which holds that an amicus cannot advance arguments that were not made by the

parties).  Instead, this Court should apply the existing law and affirm the trial

court's grant of summary judgment because the admissible evidence showed that

Russo did not suffer an adverse employment action, BMT's decisions were

motivated by neutral employment policies, Russo did not proffer any admissible

evidence that BMT's decisions were pretextual, and Russo did not proffer

admissible evidence that she was subjected to an objectively hostile working

environment within the applicable statute of limitations.

Respectfully submitted,

COZEN O'CONNOR

Dated:  June 9, 2023              BY:   _/s/ Aaron Krauss_____
                                       Aaron Krauss (62419)
                                       Cara Kaplan (329901)
                                       One Liberty Place
                                       1650 Market Street, Suite 2800

Philadelphia, PA  19103
215-665-4181
akrauss@cozen.com
*Attorneys for Appellee The Bryn Mawr Trust Company*

## **CERTIFICATE OF COMPLIANCE**

1. This brief complies with Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,318 words (excluding the parts of the brief exempted by Fed. R. App. P. 32(f)), as measured by the word count of the Microsoft Word program used for preparing the brief.

2. This brief complies with Federal Rule of Appellate Procedure 32(a)(5)(A) because it uses a size-14 point proportionally-spaced font from Microsoft Word.

3. The undersigned certifies that: (1) the text of the electronic brief filed with this Court is identical to the text of the paper copies filed and served, and (2) a virus detection program, Microsoft Windows Defender, has been run on the electronic version of this brief and no virus was found.


Dated:  June 9, 2023                    */s/ Aaron Krauss*
                                         Aaron Krauss, Esquire

## **ATTORNEY CERTIFICATION OF ADMISSION**

I, <u>Aaron R. Krauss,</u> hereby certify pursuant to 3d Cir. L.A.R. 28.3(d), that I

am a member in good standing of the Bar of the U.S. Court of Appeals for the

Third Circuit.


Dated:  June 9, 2023                          <u>*/s/ Aaron Krauss*</u>
                                                    Aaron Krauss, Esquire

## <u>ATTORNEY CERTIFICATION OF ADMISSION</u>

I, <u>Cara Kapan,</u> hereby certify pursuant to 3d Cir. L.A.R. 28.3(d), that I am a

member in good standing of the Bar of the U.S. Court of Appeals for the Third

Circuit.


Dated:  June 9, 2023                     *<u>/s/ Cara Kaplan</u>*
                                         Cara Kaplan, Esquire

## **CERTIFICATE OF SERVICE**

I, Aaron Krauss, hereby certify that on June 9, 2023, a true and correct copy

of the foregoing Brief of Appellee has been filed electronically via the Court's

ECF system, which caused it to be served electronically served upon the following

counsel of record for Appellant:

Mark D. Schwartz, Esquire
300 Sandcastle Drive
Bryn Mawr, PA 19010
(610) 525-5534
markschwartz6814@gmail.com

*Counsel for Appellant*

/s/ Aaron Krauss
Aaron Krauss, Esquire